[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 21, 2004
THOMAS  K. KAHN
CLERK

_____

No. 03-13858

_____

D. C. Docket No. 99-01566-CV-UUB


MIDRASH SEPHARDI, INC.,
YOUNG ISRAEL OF BAL HARBOR, INC.,

Plaintiffs-Counter-
Defendants-Appellants,

versus

TOWN OF SURFSIDE,
a Florida Municipal Corporation,

Defendant-Counter-
Claimant-Appellee,

PAUL NOVACK, Individually and
in his capacity as Mayor of the
Town of Surfside, et al.,

Defendants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(April 21, 2004)

Before WILSON and KRAVITCH, Circuit Judges, and GOLDBERG[*], Judge.

WILSON, Circuit Judge:

Young Israel of Bal Harbour ("Young Israel") and Midrash Sephardi ("Midrash"), two synagogues serving the Surfside-Bal Harbour-Bay Harbor Islands area of Miami-Dade County, Florida, appeal the district court's entry of summary judgment in favor of the Town of Surfside ("Surfside") on the synagogues' claims challenging the Surfside Zoning Ordinance ("SZO") under the Religious Land Use and Institutionalized Persons Act ("RLUIPA" or the "Act"), 42 U.S.C. § 2000cc *et seq.*[1] We first hold that the SZO's provision excluding churches and synagogues from locations where private clubs and lodges are permitted violates the equal terms provision of RLUIPA. Consequently, we must decide whether RLUIPA is a constitutional exercise of Congress's authority under the First, Tenth, and Fourteenth Amendments. Finding that it is, we reverse the decision of the district court.

**Background**

---

[*] Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

[1] The plaintiffs also contend that the SZO violates their rights under the First and Fourteenth Amendments, as well as their rights under the Florida Religious Freedom and Restoration Act. Because we sustain the congregations' RLUIPA challenge to the ordinance, we need not reach these additional claims.

Surfside, a small coastal town north of the City of Miami Beach and south of Bal Harbour, Florida, comprises roughly one square mile and has approximately 4,300 residents and an additional estimated tourist population of 2,030. Midrash and Young Israel (collectively the "congregations") are small Orthodox Jewish synagogues that serve the Surfside area. Together they have over one hundred members who reside in or around Surfside; their attendance triples during the winter tourist months. In addition to Midrash and Young Israel, two churches and two other synagogues presently operate in Surfside.

## I. The Challenged Ordinance

Chapter 90 of the Code of the Town of Surfside, Florida, (hereinafter "SZO § X") divides Surfside into eight zoning districts, identified in Article III of the SZO. Article IV of the SZO sets forth the specific regulations governing the applicable districts, and delineates permitted uses as of right, and uses permitted subject only to special use permit or prior conditional use approval. Surfside's zoning scheme is permissive: any use not specifically permitted is prohibited. *See* SZO § 90-6(1).

Under Article IV, churches and synagogues are prohibited in seven of the eight zoning districts. SZO permits churches and synagogues in the "RD-1 two-family residential district" ("RD-1 district") by way of conditional use permit

3

("CUP") obtained after approval by the Surfside Town Commission. SZO § 90-147(d). The SZO requires a CUP because conditional uses are "generally of a public or semipublic character . . . but because of the nature of the use and possible impact on neighboring properties, require the exercise of planning judgment. . . ." SZO § 90-41(a). CUPs are also required for educational institutions and museums, off-street parking lots and garages, public and governmental buildings, and public utilities. *See* SZO § 90-41(b)(1) - (5).[2]

Surfside's business district, which encompasses two blocks within the town, is defined by SZO § 90-152 "to provide for retail shopping and personal service needs of the town's residents and tourists." SZO § 90-152(a). Section 90-152 further states that regulations governing the business district are "intended to prevent uses and activities which might be noisy, offensive, obnoxious, or incongruous in behavior, tone or appearance and which might be difficult to police." *Id.* Theaters and restaurants are permitted on the first floor level of the

---

[2] The standards and procedures for conditional use approval are set forth in SZO § 90-41, which provides that conditional use approval shall only be granted "where it has been clearly shown that the public health, safety, morals, and general welfare will not be adversely affected . . . and that necessary safeguards will be provided for the protection of surrounding property." SZO § 90-41(b). Section 90-41 further provides that "[t]he planning and zoning board's report to the town commission may contain recommendations regarding conditions which should be imposed by the town commission in approving the conditional use," and that "[t]he town commission may establish these and/or additional conditions for an approval." SZO § 90-41(d). The SZO does not articulate any other standards governing the CUP procedure.

business district, while private clubs and lodge halls, health clubs, dance studios, music instruction studios, modeling schools, language schools, and schools of athletic instruction are only permitted above the first floor. *See* SZO § 90-152(b)(8), (18). Although permitted, Surfside does not have private clubs, social clubs, lodges or theaters. Churches and synagogues are prohibited in the business district.[3]

## II. The Litigants

Midrash was formed in 1995 and leases the second floor of 9592 Harding Avenue from Ohio Savings Bank ("OSB"). The Harding Avenue location is within Surfside's business district, on the south side of the 96th Street boundary between the towns of Bal Harbour and Surfside, three blocks away from Bay Harbor Islands. Midrash draws its membership from all three towns in the Surfside-Bal Harbour-Bay Harbor area.

Surfside denied a Midrash application for a special use permit, and denied Midrash's application for a zoning variance to operate in its current location

---

[3] Although other uses "having the same general characteristics and of such nature that the same would not lower the standards of the area" may be permitted in the business district by way of special use exception, churches and synagogues may not apply for special use exceptions because churches and synagogues are only permitted "in any district which they are *specifically* allowed." *Compare* SZO § 90-152(e) *with* SZO § 90-41(b) (emphasis added).

because Midrash failed to provide written permission from OSB.[4]  Midrash did not appeal either denial, nor did it seek OSB's permission to re-apply for either a special use permit or a variance.[5]

In March 1999, Young Israel began leasing space in the Coronado Hotel, located in Surfside's tourist district, one block south of the 96th Street boundary between the towns of Bal Harbour and Surfside and several blocks away from Bay Harbor Islands.  In November 2000, the Coronado Hotel was sold, and as a result, Young Israel congregants joined temporarily with Midrash congregants in Midrash's Harding Avenue location.  Like Midrash, Young Israel draws its membership from all three towns in the Surfside-Bal Harbour-Bay Harbor area. Young Israel has never attempted to obtain a CUP or a variance.  Both congregations maintain that any attempt to relocate in the permitted RD-1 district would be futile because suitable land is unavailable.

---

[4] Written permission from the owner is required for all applications for rezoning, including applications for variances, conditional uses, and special uses.  *See* SZO § 90-58(6), (7).

[5]  Section 90-91 provides that the town commission may grant approval for special exceptions, special use permits or variances "after having received a report and recommendation of the planning and zoning board." SZO § 90-91(a).  "Special exceptions or variances shall only be granted in cases of demonstrable and exceptional hardship as distinguished from purposes or reasons of convenience, profit or caprice." SZO § 90-91(b).  Neither party argues that the synagogues have shown, or indeed could show, the requisite hardship in order to obtain special exceptions or variances.

The members of Midrash and Young Israel adhere to the strict observance of Orthodox Judaism. Synagogue services include religious prayer, worship, song, Torah readings, sermons, group discussions, required Sabbath and holiday festivities, celebrations of religious events and religious study. A central tenet of Orthodox Jewish faith requires daily prayers and the presence of a "minyan" – a quorum of ten males over the age of thirteen – for the reading from the Torah on the weekly Sabbath and religious holidays. According to the synagogues, they have hosted weddings, Bar-Mitzvahs, Brit-Milahs, community holiday meals and festivities, lectures and group discussions on social and political issues, meetings on community welfare and public service activities, and singles events, all within the context of their religious and spiritual missions.

Orthodox Judaism forbids adherents to use cars or other means of transportation during the weekly Sabbath and religious holidays; thus, adherents prefer to gather for worship and religious study in synagogues close enough to their homes to allow them to walk to services.[6] To this end, the congregations claim that the RD-1 district is out of the required walking range for a significant

---

[6] Surfside argues that Jewish law permits the elderly and persons with medical conditions to use transportation to attend services, and thus that walking is not a *per se* requirement of Orthodox Judaism. It is worth noting at this point that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989).

number of their members, particularly elderly ones, who reside on the northern side of Surfside and in the neighboring Bal Harbour and Bay Harbor communities.

Surfside claims that the SZO was designed in part to invigorate the business district and to create a strong tax base through its retail district.[7] The economic viability of the business district – the only retail service area in Surfside – is critical to Surfside's tax base, job base, and servicing the needs of Surfside's residents. Accordingly, Surfside avers that allowing churches and synagogues in the business district would erode Surfside's tax base, on which Surfside is dependent for revenue, and would result in economic hardship on the residents.

---

[7] Surfside cites the 1995-2000 Comprehensive Plan, adopted pursuant to Local Government Comprehensive Planning and Land Development Regulation Act, FLA. STAT. ANN. § 163.3161 *et seq.* The 1995-2000 Plan states that Surfside's primary goal in drafting the SZO is to "[e]nsure that the character and location of future land uses directs growth in such a way so as to provide maximum economic benefit" to Surfside. Thus, under the 1995-2000 Plan, Surfside encourages, *inter alia*, 1) revitalization of the existing Harding Avenue business area; 2) concentration of commercial uses in and around Harding Avenue; 3) development of commercial office space along Collins Avenue between 93rd and 96th Streets to provide a greater population for retail and service shops along Harding Avenue; and 4) development of commercial uses along 94th, 95th, and 96th Streets between Collins and Harding Avenues.

The 2010 Comprehensive Plan states, *inter alia*, that Surfside's objectives are to 1) encourage private investment in the revitalization of the Harding Avenue business district; 2) maintain and improve zoning regulations which permit the concentration of commercial uses in and around the established Harding Avenue business area; and 3) maintain and improve zoning regulations which permit commercial office space along Collins Avenue as part of mixed use developments which provide concentrations of workers and/or residents to support retail and service uses along Harding Avenue.

We have said that "Florida's land use planning statutes provide for the adoption of comprehensive plans to control and direct the use and development of property within a county or municipality. Once a comprehensive plan for an area is adopted, all development approved by a governmental agency must be consistent with the plan." *Eide v. Sarasota County*, 908 F.2d 716, 718-19 (11th Cir. 1990) (citations omitted).

Because Surfside has a difficult time competing for business with the nearby Shops at Bal Harbour – and recently lost a major retail supermarket chain – Surfside claims that it cannot afford to place non-economic establishments in the business district without risking the economic stability of Surfside.

Surfside allows private clubs and similar places of assemblage in the business district because it believes such organizations are compatible with the retail character of the business district. Surfside contends that private clubs are entertainment centers and typically occupy retail space in commercial districts where revitalization is required. Surfside argues that churches and synagogues, on the other hand, contribute little synergy to retail shopping areas and disrupt the continuity of retail environments.

### III. Procedural History

In May 1999, Surfside initiated two actions against the congregations and their respective lessors in state court to enjoin the use of the Harding Avenue site and the Coronado Hotel as synagogues and to impose civil penalties for alleged violations of the SZO. The actions were removed to federal court and dismissed without prejudice. In July 1999, the congregations filed the instant action seeking

9

declaratory and injunctive relief under 42 U.S.C. § 1983.[8]  Surfside answered and filed a two-count counterclaim seeking declaratory and injunctive relief, as well as civil penalties and attorneys' fees.

Both parties moved for summary judgment.  Surfside submitted evidence from land use experts on the economic viability of a small business district, who asserted that allowing churches and synagogues in the business district would erode Surfside's tax base.  The congregations attempted to rebut this evidence by submitting affidavits from rabbis and congregants relating to the use and impact of the synagogues and the likely burden should the synagogues be required to relocate.  The district court granted summary judgment for Surfside on five of six counts of the congregations' complaint and denied summary judgment in full for the congregations.

In November 2000, the congregations filed a third amended complaint alleging an additional claim based on RLUIPA.  The district court granted

---

[8] The synagogues' original complaint alleged a facial equal protection violation, which was replaced in the second amended complaint with an as-applied equal protection claim.  Upon reviewing the record, we find that the synagogues abandoned their facial equal protection claim. The district court was not presented with and did not resolve an equal protection argument based on Surfside's treatment of private clubs and lodges.  Therefore, we will not consider this argument on appeal. *See Walker v. Jones*, 10 F.3d 1569, 1572 (11th Cir. 1994).  To the extent that the argument overlaps with the synagogues' RLUIPA claim, we discuss that issue *infra*.

summary judgment in favor of Surfside on all aspects of the congregants' RLUIPA claim and subsequently granted Surfside's counterclaim for an injunction.

We issued a stay of injunction pending appeal. Pursuant to 28 U.S.C. § 2403(a), the United States has intervened to defend the constitutionality of RLUIPA.

## Standard of Review

We review a grant of summary judgment *de novo*, applying the same legal standards that bind the district court. *See Cast Steel Prods., Inc. v. Admiral Ins. Co.*, 348 F.3d 1298, 1301 (11th Cir. 2003). The construction and constitutionality of a statute are questions of law that we review *de novo*. *See Ranch House, Inc. v. Amerson*, 238 F.3d 1273, 1277 (11th Cir. 2001).

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

11

(1986); *see also Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996).

On a summary judgment motion, the record and all reasonable inferences that can

be drawn from it must be viewed in the light most favorable to the non-moving

party.  *See Cast Steel*, 348 F.3d at 1301.

**Discussion**

I.  Justiciability

As an initial matter, we must address whether the congregations have

standing to bring their claims and, with respect to their claim challenging the CUP

procedure, whether that claim is ripe.

Both ripeness and standing are doctrines relating to the justiciability of the

congregations' claims, which encompasses both constitutional and prudential

concerns.  *See Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*,

922 F.2d 756, 759 (11th Cir. 1991).  The constitutional aspect of justiciability

focuses on whether the Article III requirements of actual "case or controversy" are

met, while the prudential aspect asks whether it is appropriate for this case to be

litigated in a federal court by these parties at this time.  *See id.* at 759-60.

Article III of the United States Constitution limits the power of federal

courts to adjudicating actual "cases" and "controversies."  U.S. CONST. art. III, §

2, cl. 1.  "This case-or-controversy doctrine fundamentally limits the power of

12

federal courts in our system of government, and helps to 'identify those disputes which are appropriately resolved through judicial process.'" *Ga. State Conference of NAACP Branches v. Cox*, 183 F.3d 1259, 1262 (11th Cir. 1999) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

The most significant doctrine of case-or-controversy is the requirement of standing. *Id*. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498 (1975). A party seeking to invoke federal jurisdiction must demonstrate: 1) an injury in fact or an invasion of a legally protected interest; 2) a direct causal relationship between the injury and the challenged action; and 3) a likelihood of redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Pittman v. Cole*, 267 F.3d 1269, 1282-85 (11th Cir. 2001). In evaluating whether a party has standing, we must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501.

Surfside argues that the congregations lack standing to assert that the SZO violates their constitutional rights because neither Midrash nor Young Israel has attempted to locate property in the RD-1 district, nor has either synagogue applied for a CUP or received OSB's permission to do so. Surfside's argument misses the

point of the congregations' contention: even if a "suitable property" existed in RD-1 district, the congregations believe they have a legal right to remain in the business district.

Surfside has already sought to enforce § 90-152 against the congregations in an earlier state court action. In the instant action, Surfside seeks an injunction prohibiting the congregations from continuing at their current location, as well as an imposition of civil penalties. As a result of Surfside's attempts to enforce the provisions of § 90-152 against them, the congregations have suffered the requisite injury for standing purposes. We find that the congregations have standing to challenge the application of business district regulations outlined in SZO § 90-152.[9]

The congregations also seek to challenge the CUP requirement and procedure found in SZO § 90-41. The district court determined that the synagogues lacked standing to contest the constitutionality of § 90-41 because by failing to follow procedures for obtaining a CUP, the congregations had not suffered an injury because of the application of § 90-41. Midrash nevertheless

_____

[9] However, we find that neither Midrash nor Young Israel has standing to challenge the application of § 90-151, which defines Surfside's tourist district and, like § 90-152, permits private clubs but excludes churches and synagogues. *See* 90-151(b)(2). Neither party is located in the tourist district, and neither party has concrete and specific plans to locate in there.

contends that it has standing to challenge the CUP because of the likelihood that Surfside will enforce the provision against it in the future. Section 90-41 requires a CUP for churches and synagogues "in any district in which they are specifically allowed." Reading § 90-41 *in pari matera* with § 90-152, the congregations, if victorious, must apply for a CUP to continue operating at their current location. Assuming the correctness of the congregations' challenge to the validity of § 90-152 under RLUIPA, the congregations argue that any declaratory or injunctive relief invalidating § 90-152 would be incomplete if their challenge to § 90-41 were not considered as well.

The congregations' CUP challenge implicates the doctrine of ripeness, which, like the standing doctrine, involves consideration of both constitutional and prudential concerns. *See Pittman*, 267 F.3d at 1278. The purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. . . ." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977). In deciding whether a claim is ripe for adjudication or review, we look primarily at two considerations: 1) the fitness of the issues for judicial decision, and 2) the hardship to the parties of withholding court consideration. *Id.* at 149.

The congregations' CUP challenge fails the prudential, or "fitness," prong of the ripeness inquiry. Because the congregations have not received a final decision on a CUP application – indeed, neither party has seriously applied for a CUP – the congregations do not raise a purely legal issue which we can decide in the abstract without further factual development. *Cf. id.* Instead, the congregations' allegations amount to mere speculation about contingent future events. We cannot determine from the record how the CUP will be applied and whether Surfside will use the CUP process to deny the plaintiffs permits to operate their synagogues. The record contains no significant evidence of Surfside's having denied CUPs in the past, and thus, the impact of the CUP requirement is not sufficiently direct and immediate as to render the issue appropriate for judicial review. Such inquiry is better postponed until the issues are presented in the more concrete circumstance of a challenge to § 90-41 as applied.

We turn to the plaintiff's challenge to SZO § 90-152 under RLUIPA.

## II. RLUIPA

Two operative subsections of RLUIPA are at issue in this case: § (a) (the "substantial burden provision"), and § (b)(1) (the "equal terms provision"). We address each of these sections in turn.

A.    Substantial Burden on Religious Exercise

16

Section (a)(1) of RLUIPA provides:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution–
> (A) is in furtherance of a compelling interest; and
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).

Section (a)(1) applies only if one of three jurisdictional tests is first met: either (A) the burden is imposed in a federally-funded program or activity; (B) the burden affects, or removal of the burden would affect, interstate commerce; or (C) the "burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes . . . individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2). "Land use regulation" is defined as a "zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has . . . [a] leasehold . . . in the regulated land or a contract or option to acquire such an interest." 42 U.S.C. § 2000cc-5(5).

17

Jurisdiction in this case is appropriate under RLUIPA's "individualized assessment" test. *See id.* at § 2000cc(a)(2)(C). The SZO requires each church and synagogue to apply for a CUP prior to operating in Surfside. This assessment procedure, which results in a case-by-case evaluation of the proposed activity of religious organizations, carries the concomitant risk of idiosyncratic application of SZO standards. Surfside officials may use their authority to individually evaluate and either approve or disapprove of churches and synagogues in potentially discriminatory ways. Thus, SZO is quintessentially an "individual assessment" regime vis-a-vis churches and synagogues.

The general rule of RLUIPA is that state action substantially burdening "religious exercise" must be justified as the least restrictive means of furthering a compelling governmental interest. *Id.* at §§ 2000cc(a)(1), 2000cc-1(a). To invoke the protection of § (a) of RLUIPA, plaintiffs bear the burden of first demonstrating that the regulation substantially burdens religious exercise. *See id.* at § 2000cc-2(b). Because the alleged burden is imposed as a result of SZO, we first consider whether "religious exercise" is implicated by either the SZO or its implementation.

       1.     Religious Exercise

Past cases have held that zoning decisions do not generally impose a substantial burden on religious exercise. *See Grosz v. City of Miami Beach*, 721 F.2d 729, 739 (11th Cir. 1983); *see also Christian Gospel Church, Inc. v. City and County of San Francisco*, 896 F.2d 1221, 1224 (9th Cir. 1990); *Messiah Baptist Church v. County of Jefferson*, 859 F.2d 820, 824-25 (10th Cir. 1988); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood*, 699 F.2d 303, 306-07 (6th Cir. 1983). These cases all considered whether the "religious exercise" implicated by zoning decisions was integral to a believer's faith. RLUIPA obviates the need for such analysis by providing a statutory definition of "religious exercise."

Under RLUIPA, "religious exercise" includes the "use, building, or conversion of real property for the purpose of religious exercise . . . ." 42 U.S.C. § 2000cc- 5(7)(B). Unlike the suggestions made in the cases cited above, "religious exercise" does not have to be "compelled by, or central to, a system of religious belief." *Id.* at § 2000cc-5(7)(A). In passing RLUIPA, Congress recognized that places of assembly are needed to facilitate religious practice, as well as the possibility that local governments may use zoning regulations to prevent religious groups from using land for such purposes. Thus, challenges to zoning ordinances are expressly contemplated by the statute, and there is no doubt that the

19

congregations' challenge concerns "religious exercise" within the meaning of

RLUIPA. Therefore, the question then becomes whether the challenged zoning

regulations, or the application thereof, effect a "substantial burden" on the

congregations' use of real property for the purpose of religious exercise. We turn

to this question.

### 2. Substantial Burden

Any exercise of statutory interpretation begins first with the language of the

statute in question. *See Nat'l Coal Ass'n v. Chater*, 81 F.3d 1077, 1081 (11th Cir.

1996). Because RLUIPA does not define "substantial burden," we give the term

its ordinary or natural meaning. *See id.* Although the legislative history of a

statute is relevant to the process of statutory interpretation, "we do not resort to

legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*,

510 U.S. 135, 147-48 (1994). We turn, therefore, to other instances in which

courts have defined or discussed the term "substantial burden."

The Supreme Court's definition of "substantial burden" within its free

exercise cases is instructive in determining what Congress understood "substantial

burden" to mean in RLUIPA. The Court's articulation of what constitutes a

"substantial burden" has varied over time. *See, e.g.*, *Lyng v. Northwest Indian

Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988) (indicating that no

20

substantial burden exists where regulation does not have "a tendency to coerce individuals into acting contrary to their religious beliefs"); *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987) (finding substantial burden when government put "substantial pressure on an adherent to modify his behavior and to violate his beliefs"); *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981) (same); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (finding a substantial burden when an individual is required to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other"); *but see Bowen v. Roy*, 476 U.S. 693, 707-08 (1986) (finding no substantial burden where government action interfered with, but did not coerce, an individual's religious beliefs); *Lyng*, 485 U.S. at 452 (same).

We have held that an individual's exercise of religion is "substantially burdened" if a regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion. *See Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir. 1995) (applying the Religious Freedom Restoration Act, we found no substantial burden when religion did not require particular means of expressing religious view and alternative means of religious expression were available); *Church of*

*Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1550 (11th

Cir. 1993) (finding a substantial burden when regulation had the effect of

mandating religious conduct).

In interpreting the same provision of RLUIPA as we have before us today,

the Seventh Circuit recently declared:

> in the context of RLUIPA's broad definition of religious exercise, a
> land-use regulation that imposes a substantial burden on religious
> exercise is one that necessarily bears direct, primary, and fundamental
> responsibility for rendering religious exercise – including the use of
> real property for the purpose thereof within the regulated jurisdiction
> generally – effectively impracticable.

*Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir.

2003) (hereinafter "*CLUB*").  While we decline to adopt the Seventh Circuit's

definition – which would render § b(3)'s total exclusion prohibition meaningless[10]

– we agree that "substantial burden" requires something more than an incidental

effect on religious exercise.

The combined import of these articulations leads us to the conclusion that a

"substantial burden" must place more than an inconvenience on religious exercise;

a "substantial burden" is akin to significant pressure which directly coerces the

---

[10] The "exclusions and limits" provision provides that "[n]o government shall impose or implement a land use regulation that –  (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction."  42 U.S.C. § 2000cc(b)(3).

religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct.

The congregations argue that requiring them to locate their synagogues in the RD-1 district constitutes a substantial burden for two related reasons. First, they contend that relocation would require their congregants to walk farther. Specifically, they suggest that the additional blocks would greatly burden congregants who are ill, young or very old. The inconvenience occasioned on these congregants would cause them to stop attending services altogether, significantly impairing the synagogues' operation. As a result, the congregations suggest that the significant decrease in attendance would require them to cease operations altogether, thereby creating an obvious substantial burden on their religious exercise.[11]

---

[11] In addition to these burdens, the congregations suggest that they will not be able to find land or a facility sizable enough to accommodate their congregations in the permitted RD-1 district. That the congregations may be unable to find suitable alternative space does not create a substantial burden within the meaning of RLUIPA. As the Seventh Circuit noted, "whatever specific difficulties [the plaintiff church] claims to have encountered, they are the same ones that face all [land users], not merely churches. The harsh reality of the marketplace sometimes dictates that certain facilities are not available to those who desire them." *Love Church v. City of Evanston*, 896 F.2d 1082, 1086 (7th Cir. 1990).

The congregations also contend that the burden of requiring them to apply for a CUP constitutes a substantial burden on religious exercise. Requiring churches and synagogues to apply for CUPs allows the zoning commission to consider factors such as size, congruity with existing uses, and availability of parking. We have found that such reasonable "run of the mill" zoning considerations do not constitute substantial burdens on religious exercise. *See Lady J.*

23

Viewing the evidence in a light favorable to the congregations, we first note that they do not claim that their current location has some religious significance such that their faith requires a synagogue at this particular site. Although they are not permitted to locate in the business district, the congregations have the alternative of applying for a permit to operate only a few blocks from their current location. For purposes of evaluating whether the SZO exacts a substantial burden within the meaning of RLUIPA, the relevant inquiry is whether and to what extent this particular requirement burdens the congregations' religious exercise.

While walking may be burdensome and "walking farther" may be even more so, we cannot say that walking a few extra blocks is "substantial," as the term is used in RLUIPA, and as suggested by the Supreme Court. The permitted RD-1 district is in the geographic center of a relatively small municipality, proximate to the business, tourist and residential districts. Deposition testimony indicated that congregants wishing to practice Orthodox Judaism customarily move where synagogues are located and do not typically expect the synagogues to move closer to them. *See* Casper Dep. at 23-24. In any given congregation, some members will necessarily walk farther than others, and, inevitably, some congregants will have greater difficulty walking than others. While we certainly sympathize with

*Lingerie, Inc. v. Jacksonville*, 176 F.3d 1358, 1362 (11th Cir. 1999).

24

those congregants who endure Floridian heat and humidity to walk to services, the burden of walking a few extra blocks, made greater by Mother Nature's occasional incorrigibility, is not "substantial" within the meaning of RLUIPA.

Were we to adopt the synagogues' reasoning, it would be virtually impossible for a municipality to ensure that no individual will be burdened by the walk to a temple of choice. Municipalities that allow religious exemptions to alleviate even the small burden of walking a few extra blocks would run the risk of impermissibly favoring religion over other secular institutions, or of favoring some religious faiths over others.

Given the facts in this case, the SZO does not exact a "substantial" burden on the congregations' religious exercise. Because we cannot say that the SZO imposes a substantial burden on religious exercise, the congregations have failed to establish a *prima facie* case under § (a). We need not reach the question of whether Surfside can justify the burden created by articulating a compelling government interest, nor need we reach the constitutionality of § (a). We turn next to the second argument advanced by the congregations under RLUIPA: whether Surfside's favorable treatment of private clubs and lodges relative to churches and synagogues violates RLUIPA's equal terms provision.

B.     Equal Terms

25

The congregations argue that the SZO violates § (b)(1) of RLUIPA, which provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).

The Seventh Circuit has stated that "the substantial burden [§ (a)] and nondiscrimination provisions [§ (b)] are operatively independent of one another." *CLUB*, 342 F.3d at 762. Indeed, the application of § (b)(1) occasions difficulties of statutory construction not encountered when addressing § (a)'s prohibition against substantial burdens on religious exercise. First, § (b)(1) does not require the plaintiff to meet a threshold jurisdictional test similar to that articulated in § (a)(2). Second, while § (b)(1) has the "feel" of an equal protection law, it lacks the "similarly situated" requirement usually found in equal protection analysis. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447-50 (1985). Third, unlike § (a), § (b)(1) renders a municipality strictly liable for its violation, rendering a discriminatory land use regulation *per se* unlawful without regard to any justifications supplied by the zoning authority. We address each problem in turn.

        1.     Jurisdictional Nexus

The plain terms and structure of RLUIPA indicate that the jurisdictional prerequisites included in § (a) and discussed above do not apply to § (b)'s prohibition on discrimination against and exclusion of religious institutions. First, § (a)(2) specifically enumerates three jurisdictional tests, at least one of which must be satisfied prior to § (a)(1)'s application, while § (b) is silent as to jurisdictional tests. Second, § (a)(2), by its terms, applies to "subsection" (a). *See* 42 U.S.C. § 2000cc(a)(2) ("This *subsection* applies in any case in which [listing jurisdictional tests].") (emphasis added). Finally, the jurisdiction limits relate to burdens imposed by a government – language which is consistent with § (a)(1)'s prohibition on imposing a substantial burden without justification. *See id.* at § 2000cc(a)(1) ("No government shall impose or implement a land use regulation in a manner that imposes a substantial *burden* on the religious exercise of a person . . . .") (emphasis added).

Congress included the three jurisdictional limitations in 42 U.S.C. § 2000cc(a)(2) to satisfy the Supreme Court's concerns regarding congressional authority to enact legislation protecting the free exercise of religion. *See, e.g.*, *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997) (striking down the Religious Freedom Restoration Act because it was a "considerable congressional intrusion into the State's traditional prerogative and general authority to regulate"). It was

27

Congress's belief that applying RLUIPA in these more limited situations will alleviate federalism concerns raised by earlier religious liberty legislation. *See* 146 CONG. REC. S7774-01, \*S7775 (2000) (joint statement of Sens. Hatch and Kennedy on the Religious Land Use and Institutionalized Person Act of 2000) (hereinafter "Joint Statement").

As discussed above, the SZO imposes a system of individualized assessments within the meaning of 42 U.S.C. § 2000cc(a)(2)(C), which requires that the burden be "imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes . . . individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2). RLUIPA's text and structure suggest that § (a)(2)'s threshold jurisdictional test does not apply to § (b)'s equal terms provision. While the application of a jurisdictional test to § (b) claims will provide fodder for future exercises in statutory interpretation, we do not reach this question. Because we find that the congregations allege conduct satisfying the third jurisdictional prong of § (a)(2), we do not reach the question of whether they are *required* to satisfy this jurisdictional test.

2.    "Similarly Situated"

The parties assume that § (b) applies to assemblies and institutions that are similarly situated in all relevant respects. *See, e.g.*, *Cleburne*, 473 U.S. at 439. Indeed, the district court adopted this familiar "similarly situated" test when evaluating the congregations' claims. The district court concluded that private clubs and other secular institutions are not similarly situated to churches and synagogues because "private clubs provid[e] more of a social setting [and] provide more synergy for the shopping district in keeping with the purpose of § 90-152," than churches and synagogues. *Midrash Sephardi v. Surfside*, No. 99-1566-CIV-Ungaro-Benages/Brown, at 17 (S.D. Fla. July 13, 2000) (order granting partial summary judgment). The district court also found that "churches, synagogues, educational or philanthropic museums (including museums), parking lots and garages, public and governmental buildings and public utility/public services uses are all Conditional uses . . . [which] . . . fall within Justice Harlan's natural perimeter test,[12] as this would apply to a group of secular and non-secular uses that 'are of a public or semi-public character.'" *Id.* (citing SZO § 90-41(a)).

---

[12] *See Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (Harlan, J., concurring) ("In any particular case the critical question is whether the circumference of legislation encircles a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter.").

29

Section (b)(1) makes it clear that the relevant "natural perimeter" for consideration with respect to RLUIPA's prohibition is the category of "assemblies or institutions." The district court erred by not considering RLUIPA's statutory categorization as the relevant "perimeter." By adopting Surfside's conditional use definition[13] as the relevant "natural perimeter," the district court overlooked the express provisions of RLUIPA which require a direct and narrow focus. Under RLUIPA, we must first evaluate whether an entity qualifies as an "assembly or institution," as that term is used in RLUIPA, before considering whether the governmental authority treats a religious assembly or institution differently than a nonreligious assembly or institution. *See* 42 U.S.C. 2000cc(b)(1).

Because RLUIPA does not define "assembly" or "institution," we construe these terms in accordance with their ordinary or natural meanings. *See Nat'l Coal Ass'n*, 81 F.3d at 1081.

An "assembly" is "a company of persons collected together in one place [usually] and usually for some common purpose (as deliberation and legislation, worship, or social entertainment)," WEBSTER'S 3D NEW INT'L UNABRIDGED

---

[13] Conditional uses, which include churches, synagogues, educational institutions, museums, off-street parking lots and garages, public and governmental buildings, and public utilities are "generally of a public or semipublic character . . . but because of the nature of the use and possible impact on neighboring properties, require the exercise of planning judgment . . . ." SZO § 90-41(a).

DICTIONARY 131 (1993); or "[a] group of persons organized and united for some common purpose." BLACK'S LAW DICTIONARY 111 (7th ed. 1999). An institution is "an established society or corporation: an establishment or foundation esp. of a public character," WEBSTER'S 3D NEW INT'L UNABRIDGED DICTIONARY 1171 (1993); or "[a]n established organization, esp. one of a public character . . . ." BLACK'S LAW DICTIONARY 801 (7th ed. 1999).

The SZO does not define the terms "church" or "synagogue," but does group them with "place[s] of assembly." *See* SZO § 90-226(b) (adopting regulations related to parking spaces). According to the SZO, a private club is "a building and facilities or premises, owned and operated by a corporation, association, person or persons *for social, educational or recreational purposes*, but not primarily for profit and not primarily to render a service which is customarily carried on as a business." SZO § 90-2(20) (emphasis added).

The SZO's definition of private club comports with a natural and ordinary understanding of "assembly" as a group gathered for a common purpose. Like churches and synagogues, private clubs are places in which groups or individuals dedicated to similar purposes – whether social, educational, recreational, or otherwise – can meet together to pursue their interests. We conclude therefore that churches and synagogues, as well as private clubs and lodges, fall within the

31

natural perimeter of "assembly or institution."[14]  Finding that private clubs and

lodges are similarly situated to churches and synagogues, we turn to whether

under RLUIPA, Surfside may treat them differently.

### 3.    Violation of § (b)

As noted above, the text of  SZO § 90-152, which permits private clubs and

other secular assemblies, excludes religious assemblies from Surfside's business

district.  Because we have concluded that private clubs, churches and synagogues

fall under the umbrella of "assembly or institution" as those terms are used in

RLUIPA, this differential treatment constitutes a violation of § (b)(1) of RLUIPA.

### 4.    Level of Scrutiny

The interested parties in this case disagree as to the applicable level of

scrutiny a law violating § (b) must undergo.  Surfside assumes that it may justify a

violation of § (b) by demonstrating that the varying treatment of different

assemblies is rationally related to a legitimate purpose advanced by Surfside – the

so-called "rational basis" review.   The congregations argue that the ordinance

must undergo strict scrutiny: Surfside must demonstrate that its ordinance is

---

[14] Indeed, the legislative history indicates that § (b)(1) was intended to apply in *precisely* the situation presented here.  *See* Joint Statement, at *S7774 ("Zoning codes frequently exclude churches in places where they permit theaters, meeting halls, and other places where large groups of people assemble for secular purposes.").

narrowly tailored to advance a compelling interest. Finally, the United States submits that § (b)'s prohibition does not allow a defendant to escape liability by providing a "rational basis" or "compelling interest" – in effect, holding government strictly liable a violation of § (b).

To clarify our analysis of a § (b) violation, we examine the jurisprudential foundations for Congress's enactment of § (b).

Mindful of the Supreme Court's admonition that a government would inhibit free exercise rights "if it sought to ban such acts of abstentions only when they are engaged in for religious reasons," *Employment Div., Dept. of Human Res. v. Smith*, 494 U.S. 872, 877 (1990), Congress enshrined similar non-discrimination principles in § (b)'s requirement that religious and nonreligious assemblies or institutions be treated equally. *See* Joint Statement, at *S7776 ("Sections [(b)(1) and (2)] . . . enforce the Free Exercise Clause rule against laws that burden religion and are not neutral and generally applicable."); H.R. REP. NO. 106-219, at 7 n.9 (1999).

Prior to *Smith*, the Supreme Court applied strict scrutiny to cases in which a government discriminated against religion or religious exercise. *See, e.g.*, *Thomas*, 450 U.S. at 718 ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state

interest."); *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) ("[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.").  While *Smith* abrogated the application of strict scrutiny by emphasizing that such review would not apply to neutral laws of general applicability that incidentally burden religious exercise, *see id.* at 879, the Court indicated that the heightened standard of review would continue to apply where a law fails to similarly regulate secular and religious conduct implicating the same government interests.  *See id.* at 886 n.3 ("[W]e strictly scrutinize governmental classifications based on religion.") (citations omitted).  After *Smith*, it remains true that a law that is not neutral or generally applicable must undergo strict scrutiny.  *See id.* at 879.

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah* presented an opportunity for the Supreme Court to elaborate upon what was meant by neutrality and general applicability.  In examining a series of ordinances which had the effect of proscribing ritualistic animal sacrifice by adherents of the Santeria religion, the Court confirmed that the government violates Free Exercise rights when it selectively imposes burdens on religious conduct.  508 U.S. 520 (1993).  Although the *Lukumi* Court found the city's proscription facially neutral, the Court nevertheless concluded that the ordinances violated principles of neutrality by

34

improperly targeting the Santeria religion. *See id.* at 534. Recognizing that the ordinances were both underinclusive and overbroad, the Court concluded that they were not neutral, but rather "had as their object the suppression of religion." *Id.* at 542. The Court also found that the ordinances were not generally applicable because they pursued the city's interests only against conduct motivated by religious belief. *Id.* at 545. The Court then subjected the ordinances to strict scrutiny, striking them down after determining that they were not narrowly tailored to accomplish government's interests, nor were the governmental interests compelling. *See id.* at 546.

RLUIPA's equal terms provision codifies the *Smith-Lukumi* line of precedent. By requiring equal treatment of secular and religious assemblies, RLUIPA allows courts to determine whether a particular system of classifications adopted by a city subtly or covertly departs from requirements of neutrality and general applicability. A zoning law is not neutral or generally applicable if it treats similarly situated secular and religious assemblies differently because such unequal treatment indicates the ordinance improperly targets the religious character of an assembly. Thus, a violation of § (b)'s equal treatment provision, consistent with the analysis employed in *Lukumi*, must undergo strict scrutiny. *Id.*

Indeed, a closer look at § 90-152 reveals that Surfside improperly targeted religious assemblies and violated Free Exercise requirements of neutrality and general applicability. While merely the mention of church or synagogue in a zoning code does not destroy a zoning code's neutrality, we must nevertheless be mindful of the potential for impermissible "religious gerrymanders," which may render a zoning code operatively non-neutral. *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (Harlan, J., concurring). As we have noted, the text of § 90-152 treats religious assemblies differently than secular assemblies by excluding religious assemblies from the business district, a factor that is enough to constitute a violation of § (b) of RLUIPA, and, as we discuss below, also indicates an infringement of the *Smith* principles of neutrality and general applicability. With respect to neutrality, the purpose and operation of the ordinance reveal an impermissible attempt to target religious assemblies.

The purpose and operation of Surfside's business district is "to provide for retail shopping and personal service needs of the town's residents and tourists." SZO § 90-152(a). The regulations governing the business district are "intended to prevent uses and activities which might be noisy, offensive, obnoxious, or incongruous in behavior, tone or appearance and which might be difficult to police." *Id.*

36

Religious institutions, Surfside argues, are open only once a week, usually on a day or at a time that other area businesses are closed. Surfside maintains that the "central use" of a religious institution is as a "single destination" where congregants fill a "spiritual need" and then, presumably, vacate the area. For these reasons, Surfside contends that churches and synagogues do not cater to or stimulate the shopping and retail needs of Surfside residents in a way that comports with the objectives of the business district. Private clubs, on the other hand, allegedly provide a more "social" setting and promote "synergy" with the shopping district because the nature of activity in a club or lodge is entertainment.[15]

The congregations provide evidence that they meet throughout the week for purposes other than religious services, including Torah classes and group discussion. They aver that they hold social and entertainment gatherings, albeit within the context of their religious and spiritual mission. The congregations submit evidence suggesting that members regularly patronize area shops before and after services and meetings. The evidence also demonstrates that the

---

[15] Surfside does not define "synergy" but the evidence suggests that Surfside's primary concern was encouraging an increase in consumer traffic in its business and tourist districts. While Surfside suggests that allowing churches and synagogues will erode its tax base and ultimately require a decrease in services offered by Surfside to its residents, it does not devote much time to this argument. As described below, § 90-152 is both over- and underinclusive with respect to Surfside's goal of synergy, no matter how that term is defined.

congregations themselves purchase food, paper, and other supplies from the businesses in the area. The presence of synagogues has also led to the opening of kosher food businesses in the area. This evidence indicates that § 90-152 is overinclusive with respect to Surfside's objectives of promoting retail activity and synergy because the synagogues contribute to the retail and commercial activity of the business district.

Our review of the record indicates that § 90-152 is also underinclusive for the interests Surfside seeks to advance. The SZO's definition of private clubs belies Surfside's argument that private clubs are "typical retail and service activities" by indicating that private clubs are organizations existing "for social, educational or recreational purposes, but not primarily for profit and not primarily to render a service which is customarily carried on as a business." SZO § 90-2(20). Moreover, permitted private clubs include organizations that often meet weekly, monthly, or bi-monthly, and sometimes during non-business hours – hours of operation which fail to stimulate an increase in consumer traffic to the business district. Other than conclusory assertions that private clubs are more social than churches – assertions disputed by evidence submitted by the congregations – and that the increased sociability lends itself to increased patronage of local establishments, Surfside provides no evidence that private clubs and lodges

38

*actually* contribute to the business district in a way appreciably different than religious institutions. Surfside's stated goal of retail synergy is pursued only against religious assemblies, but not other non-commercial assemblies, thus devaluing the religious reasons for assembling. Under *Lukumi*, this discriminatory treatment extinguishes an ordinance's neutrality. *See Lukumi*, 508 U.S. at 538.

As the evidence suggests, the synagogues are not incongruous with the stated objectives and purposes of the business district advanced by Surfside through the SZO. By prohibiting religious assemblies in Surfside's business district, § 90-152 improperly targeted religious assemblies for dissimilar treatment and is therefore, not neutral.[16]

We turn to the second Free Exercise requirement that a law burdening religious practice must be generally applicable. *Lukumi*, 508 U.S. at 542. Surfside argues that the SZO places restrictions not only on religious entities, but also on other organizations, including educational institutions and museums, off-street parking lots and garages, public and governmental buildings, and public utilities.

---

[16] We reject Surfside's contention that the SZO is neutral because there is no evidence of selective and discriminatory intent against Orthodox Jews, a pattern of hostility or discriminatory animus toward the synagogues, or evidence that Surfside directly targeted religion in enacting the SZO. Under *Lukumi*, it is unnecessary to identify an invidious intent in enacting a law – only Justices Kennedy and Stevens attached significance to evidence of the lawmakers' subjective motivation. *See id.* at 540-42 (Kennedy, J., concurring); *see also id.* at 558 (Scalia, J., concurring in part and concurring in judgment).

Zoning laws inherently distinguish between uses and necessarily involve selection and categorization, often restricting religious assemblies to designated districts and frequently requiring that religious assemblies complete a conditional use application procedure. *See id.* at 542-43 ("All laws are selective to some extent . . . [but] inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation.").

Surfside's treatment of synagogues as categorically different because they have "[n]ever held a social, communal, public service or other community affair event which is *unrelated to [their] religious and spiritual mission or purpose*" clearly implicates the Supreme Court's requirement that governments should not treat secular motivations more favorably than religious motivations. *See generally id.*; *see also Smith*, 494 U.S. at 877. The operation of § 90-152 to exclude religious assemblies because of their spiritual mission is just one indication that Surfside improperly excluded religious assemblies because of their religiosity. Another indication is the underinclusiveness of § 90-152. *See Lukumi*, 508 U.S. at 542-45 (concluding that because the city's ordinances pursed the city's interests only against religious conduct, the ordinances were not generally applicable). The inclusion of private clubs in the business district, which operate for "social,

40

educational or recreational purposes, but not primarily for profit and not primarily to render a service which is customarily carried on as a business," *see* SZO § 90-2(20), is incompatible with Surfside's asserted goals of achieving maximum economic benefit and the concentration and development of commercial uses along Harding Avenue. *See* 1995-2000 Comprehensive Plan. Because private clubs do not serve Surfside's economic and commercial goals but are nevertheless permitted in the business district indicates that § 90-152 pursues Surfside's interests only against conduct motivated by religious belief.

Including private clubs and lodges as permitted uses in Surfside's business district, while simultaneously excluding religious assemblies, violates the principles of neutrality and general applicability because private clubs and lodges endanger Surfside's interest in retail synergy as much or more than churches and synagogues. Surfside's failure to treat the analogous groups equally indicates that Surfside improperly targeted religious assemblies.

As demonstrated above, a violation of § (b)'s equal treatment provision indicates that the offending law also violates the *Smith* rule requiring neutrality and general applicability. Consistent with the analysis employed in *Lukumi*, a law violating § (b) must therefore undergo the most rigorous of scrutiny. *Cf. Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d

41

Cir. 1999) (applying strict scrutiny to overturn regulation that "indicat[ed] that the [government] made a value judgment that secular (i.e., medical) motivations for wearing a beard [were] important enough to overcome its general interest in uniformity but that religious motivations [were] not").

We turn to whether Surfside, through the implementation of the SZO, "advance[s] interests of the highest order" and is narrowly tailored in pursuit of those interests. *Lukumi*, 508 U.S. at 546. As we have discussed, SZO § 90-152 is overinclusive and underinclusive in substantial respects. The proffered interests of retail synergy are not pursued against analogous nonreligious conduct, and those interests could be achieved by narrower ordinances that do not improperly distinguish between similar secular and religious assemblies. Because § 90-152 treats religious institutions on less than equal terms with nonreligious institutions, § 90-152 is invalid under § (b)(1) of RLUIPA.[17] Finding that SZO § 90-152 is not

---

[17] This conclusion does not inhibit a zoning authority's right to adopt other reasonable "run of the mill" zoning regulations – such as those related to size, parking, safety and health concerns – even though such regulations may have the effect of distinguishing between assemblies or institutions. For example, Surfside may regulate the number of parking spaces required for each facility, *see* SZO § 90-226, or restrict the size of assemblies or institutions, as the SZO does by prohibiting them on the first floor of buildings in the business district. As long as restrictions or distinctions are unrelated to the religious characterization, RLUIPA is not implicated. *See also* Joint Statement, at *S7776 ("This Act does not provide religious institutions with immunity from land use regulation, nor does it relieve religious institutions from applying for variances, special permits or exceptions, hardship approval, or other relief provisions in land use regulations, where available without discrimination or unfair delay.").

narrowly tailored to Surfside's interest, we need not address whether this interest is of "the highest order." *See Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 232 (1987).

### III. Constitutionality of RLUIPA

Surfside argues that if we find that the SZO violates RLUIPA, such a finding is not dispositive because RLUIPA is unconstitutional for three reasons: 1) RLUIPA exceeds Congress's power under § 5 of the Fourteenth Amendment; 2) RLUIPA establishes religion in violation of the First Amendment; and 3) Congress lacked authority to pass RLUIPA because RLUIPA infringes on state sovereignty under the Tenth Amendment. The district court did not address the constitutionality of RLUIPA, instead finding that the congregations did not allege conduct that would invoke its protections. After a brief review of RLUIPA's statutory and case law predecessors, we turn to Surfside's contentions, confining our analysis of RLUIPA's constitutionality to the provisions implicated by Surfside's conduct. We conclude that RLUIPA withstands our scrutiny and is a proper exercise of Congress's § 5 powers.

### A.    RLUIPA Background

In 1990, the Supreme Court decided *Smith*, which held that the Free Exercise Clause of the First Amendment does not exempt an individual from

compliance with a valid and neutral law of general applicability merely because the law incidentally burdens religious conduct. *See Smith*, 494 U.S. at 879. In response to *Smith*, Congress enacted the Religious Freedom Restoration Act ("RFRA"), 107 Stat. 1488 (codified at 42 U.S.C. §§ 2000bb *et seq.*). RFRA sought to rescind *Smith* and restore what some refer to as the pre-*Smith* standard: the "compelling interest/least restrictive means" test found in *Sherbert*, 374 U.S. at 407-09, and *Yoder*, 406 U.S. at 214-15.

Four years later, the Supreme Court struck down RFRA as it relates to state and local governments in *City of Boerne v. Flores*, 521 U.S. 507 (1997). Congress may enforce constitutional rights pursuant to § 5 of the Fourteenth Amendment. However, in *Boerne*, the Supreme Court held that by enacting RFRA, Congress had exceeded that authority by *defining* rights instead of simply *enforcing* them. *Boerne*, 521 U.S. at 532. RLUIPA is a response to *Boerne*, becoming the latest congressional effort to offer statutory protection to religious liberty. *See* H.R. REP. NO. 106-219, at 4 (commenting that "H.R. 1691 [RLUIPA's legislative predecessor] was introduced, in part, in response to the Supreme Court's partial invalidation of the Religious Freedom Restoration Act . . . .").

Congress sought, through RLUIPA, to protect religious land uses from discriminatory processes used to exclude or otherwise limit the location of

churches and synagogues in municipalities across the country. *See* Joint Statement, at *S7774-S7775. As indicated during nine hearings held before both houses of Congress, RLUIPA targets zoning codes which use individualized and discretionary processes to exclude churches, especially "new, small or unfamiliar churches . . . [like] black churches and Jewish shuls and synagogues." *Id.* at *S7774. The legislative record contained statistical, anecdotal and testimonial evidence suggesting that discrimination is widespread and typically results in the exclusion of churches and synagogues even in places where theaters, meeting halls and other secular assemblies are permitted. *Id.* at *S7774. According to RLUIPA co-sponsors Senators Hatch and Kennedy:

> The hearing record compiled massive evidence that [the right to build, buy, or rent space for churches and synagogues] is frequently violated. Churches in general, and new, small or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation.

*Id.* at *S7774.

RLUIPA features two primary means of addressing these perceived infringements on religious liberty. RLUIPA revives RFRA's substantial burden test, confining the reach of this test to land use regulations that first pass jurisdictional muster. RLUIPA also contains § (b), a wholly new provision

directed at zoning codes that discriminate against, or among religious institutions or unreasonably limit religious institutions in a jurisdiction. *See* 42 U.S.C. § 2000cc(b). As discussed above, SZO § 90-152 violates § (b)(1) of RLUIPA.

B.     Fourteenth Amendment

Surfside first argues that by enacting RLUIPA, Congress exceeded its power under § 5 of the Fourteenth Amendment "to enforce, by appropriate legislation, the provisions of this article." U.S. CONST. amend. XIV, § 5.

The Supreme Court has characterized Congress's power under § 5 of the Fourteenth Amendment as "remedial." *South Carolina v. Katzenbach*, 383 U.S. 301, 326 (1966). As the Court noted in *Boerne*:

> The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States . . . . Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the "provisions of [the Fourteenth Amendment]."

*Boerne,* 521 U.S. at 519.

Neither party disputes, nor is there reason to doubt, that RLUIPA purports to protect certain religious liberties guaranteed by the First Amendment. In determining whether RLUIPA is an appropriate exercise of Congress's § 5 power,

we must first determine whether Congress has the authority to enact legislation to enforce the rights guaranteed by the First Amendment. *See Boerne*, 521 U.S. at 519. *Boerne* answered this question in the affirmative. *See id.*; *see also Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (holding that the "fundamental concept of liberty embodied in [the Fourteenth Amendment's Due Process Clause] embraces the liberties guaranteed by the First Amendment").

The second inquiry under *Boerne* is whether RLUIPA "enforces" a constitutional right without substantively altering that right. *See id.* One way in which we determine whether § 5 legislation enforces a right is by evaluating whether the legislation is congruent and proportional to the injury to be prevented or remedied. *Id.* at 520. Under *Boerne*, preventative measures are more likely to withstand scrutiny if they prohibit actions that themselves have "a significant likelihood of being unconstitutional." *Id.* at 532. Thus, according to *Boerne*, if RLUIPA merely codifies existing constitutional principles, it is an acceptable use of Congress's § 5 remedial tool.[18]

When conducting this analysis, we accord "great weight to the decisions of Congress," *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94,

---

[18] As discussed above, SZO § 90-152 violates § (b) of RLUIPA, which also indicates that § 90-152 is neither neutral nor generally applicable. Because § 90-152 fails these two Free Exercise requirements, it has a "significant likelihood of being unconstitutional."

102 (1973), and give Congress "wide latitude" in enacting preventative or remedial measures. *Boerne*, 521 U.S. at 520. As Justice Frankfurter has noted, courts must give "due regard to the fact that [they are] not exercising a primary judgment but [are] sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 164 (1951) (Frankfurter, J., concurring). The customary deference accorded the judgments of Congress is certainly appropriate when, as here, Congress has specifically considered the question of the law's constitutionality. *See Rotsker v. Goldberg*, 453 U.S. 57, 64 (1981).

The United States argues that RLUIPA is a reasonable means of protecting the non-discrimination principles embodied in the Free Exercise and the Establishment Clauses of the First Amendment, as well as the Equal Protection Clause of the Fourteenth Amendment.

A survey of Free Exercise cases indicates that government action that specifically targets religion or religious conduct for distinctive treatment can be an impermissible intrusion on an individual's free exercise rights. *See Lukumi*, 508 U.S. at 534 ("Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality . .

. . '[We] must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.'") (quoting *Walz*, 397 U.S. at 696 (Harlan, J., concurring)); *McDaniel v. Paty*, 435 U.S. 618 (1978) (invalidating law that disqualified members of the clergy from holding certain public offices); *Fowler v. Rhode Island*, 345 U.S. 67, 69-70 (1953) (invalidating law which discriminated among religious sects). In *Lukumi*, the Supreme Court reaffirmed the principle that free exercise rights must be protected against laws that selectively impose burdens on conduct motivated by religious belief. *See Lukumi*, 508 U.S. at 543; *see also Hobbie*, 480 U.S. at 146 (overturning state decision to withhold unemployment compensation to an employee who refused to work on her Sabbath as violative of Free Exercise rights); *FOP*, 170 F.3d at 366-67 (holding that a police department policy prohibiting beards but allowing a medical exemption violated the nondiscrimination principles of the Free Exercise Clause).

The Establishment Clause mandates equal treatment of religious and secular assemblies based on the converse theory: the government may not favor the religious over non-believers because such favoritism would amount to an impermissible establishment of religion. *See, e.g.*, *Gillette v. United States*, 401 U.S. 437, 450 (1971) ("[T]he Establishment Clause prohibits government from abandoning secular purposes . . . to favor adherents of any sect or religious

organization."). The Supreme Court has consistently disapproved of unequal treatment that elevates religion over secular interests. *See generally Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989) (striking down law exempting only religious publications from taxation); *Engel v. Vitale,* 370 U.S. 421 (1962) (striking down state-sponsored prayers); *see also Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 704 (1994) (stating that "civil power must be exercised in a manner neutral to religion"); *Zorach v. Clauson*, 343 U.S. 306, 314 (1952) (stating that Government may not "prefer[] those who believe in no religion over those who do believe"). This bar to unequal treatment is also the fundamental point of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), which held that the Establishment Clause requires that the "principal or primary effect [of governmental action] must be one that neither advances nor inhibits religion." *Id.* at 612.

In short, the equal treatment required by the two Religion Clauses serves to protect individuals from encroachments on the right to freely engage in religious exercise, and offers protection from government action that impermissibly favors religion.

Finally, the Equal Protection Clause mandates that no state shall "deny to any person within its jurisdiction the equal protection of the laws," U.S. CONST.

amend. XIV, § 1, cl. 4, which provides support for § (b) by "direct[ing] that all persons similarly situated should be treated alike." *Cleburne*, 473 U.S. at 439.

In *Cleburne*, the Supreme Court reviewed a city's land use regulation that distinguished between homes for persons with mental disabilities from multiple dwellings, boarding and lodging houses, fraternity or sorority houses, and dormitories. *Cleburne* held that the difference between a group home and these other uses was irrelevant unless the group home and its occupants "would threaten legitimate interests of the city in a way that other permitted uses such as boarding houses and hospitals would not." *Id.* at 448. By employing an equal protection analysis to examine whether a law applies equally to similarly situated assemblies or institutions, courts can ferret out laws that are facially neutral but discriminate in fact. *See Lukumi*, 508 U.S. at 540.

We agree with Justice O'Connor's observation that "the Religion Clauses – the Free Exercise Clause, the Establishment Clause, the Religious Test Clause, . . . and the Equal Protection Clause as applied to religion – all speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits." *Kiryas Joel*, 512 U.S. at 715 (O'Connor, J., concurring). On the face of RLUIPA's equal terms provision, the echoes of these constitutional principles are unmistakable. Simply put, to deny

equal treatment to a church or a synagogue on the grounds that it conveys religious ideas is to penalize it for being religious. Such unequal treatment is impermissible based on the precepts of the Free Exercise, Establishment and Equal Protection Clauses.

Congress's power is certainly not without limits, but we find that Congress's findings regarding the widespread discrimination against religious institutions are plausible and provide a basis for concluding that RLUIPA remedies and prevents discriminatory land use regulations. *See United States v. Holmes*, 838 F.2d 1175, 1177 (11th Cir. 1988) ("[W]here a statute does not discriminate on racial grounds or against a suspect class, Congress'[s] judgment will be sustained in the absence of persuasive evidence that Congress had no reasonable basis for drawing the lines that it did."). RLUIPA tailors the nondiscrimination prohibitions annunciated above to land use regulations because Congress identified a significant encroachment on the core First and Fourteenth Amendment rights of religious observers. Because § (b)(1) of RLUIPA codifies existing Free Exercise, Establishment Clause and Equal Protection rights against states and municipalities that treat religious assemblies or institutions "on less than equal terms" than secular institutions, § (b) is an appropriate and constitutional use of Congress's authority under § 5 of the Fourteenth Amendment.

C.    Establishment Clause

We turn to Surfside's contention that RLUIPA impermissibly elevates religion in a manner contravening the Establishment Clause.

At its core, Surfside's argument implicates the intersection of both religious liberties principles found in the First Amendment – the right to free exercise of religion and the prohibition against establishment of religion.  As courts strive for a "benevolent neutrality" toward religion that allows religious exercise to exist without either endorsement or interference, they do so with the recognition that the two Religion Clauses, "both of which are cast in absolute terms," would, if taken to their logical extremes, "tend to clash with [each] other."  *Walz*, 397 U.S. at 668-69.  When deciding these cases, courts are sometimes forced to enter the debate about whether the Free Exercise Clause allows exemptions from burdensome laws, *see, e.g.*, *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 336 (1987) (upholding a law which granted religious employers an exemption from compliance with Title VII's protection against religious discrimination), or whether the Establishment Clause *prohibits* such exemptions, either on the grounds that an exemption impermissibly discriminates against the nonreligious, *see e.g.,*, *Texas Monthly*, 489 U.S. at 9 (plurality opinion) (government "may not place its prestige, coercive authority, or

53

resources behind a single religious faith or behind religious belief in general . . .

conveying the message that those who do not contribute gladly are less than full

members of the community"), or on the grounds that the exemption impermissibly

advances religion. *See, e.g.*, *Edwards v. Aguillard*, 482 U.S. 578, 593 (1987)

(striking down Louisiana's Creationism Act because it impermissibly endorses

religion).

The three-part test provided by *Lemon* helps determine whether a statute

achieves neutrality towards religion by avoiding "sponsorship, financial support,

and active involvement of the sovereign in religious activity." 403 U.S. at 612

(quoting *Walz*, 397 U.S. at 668). A statute will survive an Establishment Clause

attack if 1) it has a secular legislative purpose, 2) its primary effect neither

advances nor inhibits religion, and 3) it does not foster excessive government

entanglement with religion. *Id.* at 612-13.[19] "State action violates the

Establishment Clause if it fails to satisfy any of these prongs." *Edwards*, 482 U.S.

at 583.

1.    Purpose

---

[19] The Supreme Court has acknowledged that *Lemon*'s second and third prongs are often interrelated and the simplest way of evaluating whether a statute results in impermissible entanglement is to assess it using the same factors used to examine the "effect" prong. *See Agostini v. Felton*, 521 U.S. 203, 232-33 (1997). Evaluating *Lemon*'s second and third prongs together or separately does not affect our analysis; for purposes of clarity, we evaluate each separately.

*Lemon* first requires that the law at issue serve a "secular legislative purpose." 403 U.S. at 612. The Supreme Court has upheld statutes that "alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 335; *see also Hobbie*, 480 U.S. at 144-45 (noting that "the government may (and sometimes must) accommodate religious practices . . . without violating the Establishment Clause"). In requiring neutrality toward religion, the government need not be "oblivious to impositions that legitimate exercises of state power may place on religious belief and practice," *Kiryas Joel*, 512 U.S. at 705, nor must the "government show a callous indifference to religious groups." *Zorach*, 343 U.S. at 314. Where, as here, a law's purpose is to alleviate significant government interference with the exercise of religion, that purpose does not violate the Establishment Clause.

2. Effect

The second requirement under *Lemon* is that the law in question have a "principal or primary effect . . . that neither advances nor inhibits religion." 403 U.S. at 612. The Supreme Court has said that "[a] law is not unconstitutional simply because it *allows* churches to advance religion . . . . For a law to have forbidden 'effects' under *Lemon*, it must be fair to say that the *government itself*

55

has advanced religion through its own activities and influence." *Amos*, 483 U.S. at 337.

We find unpersuasive Surfside's argument that the application of RLUIPA's equal terms provision gives an impermissible special preference to religious interests. *Amos* makes it clear that a law does not violate the Establishment Clause simply because it lifts burdens imposed on religious institutions without affording similar benefits to secular entities. 483 U.S. at 338 ("[W]e see no reason to require that the [burden-alleviating] exemption comes packaged with benefits to secular entities."). Moreover, contrary to Surfside's assertions, RLUIPA does not allow religious assemblies to avoid the application of zoning regulations. RLUIPA does not impose affirmative duties on states that would require them to facilitate or subsidize the exercise of religion. RLUIPA instead calls for exactly the opposite – forbidding states from imposing impermissible burdens on religious worship.

For purposes of analyzing the second prong of *Lemon*, a relevant and meaningful distinction exists between statutes whose effect is to advance religion and statutes whose effect is to allow religious organizations to advance religion. *See Amos*, 483 U.S. at 336-337; *Kiryas Joel*, 512 U.S. at 719 (O'Connor, J., concurring). RLUIPA, by mandating *equal* as opposed to *special* treatment for

religious institutions, does not advance religion by making it easier for religious organizations themselves to advance religion.

3.      Entanglement

Under *Lemon*'s third prong, a statute must not result in excessive entanglement between church and state.  403 U.S. at 613.  RLUIPA does not require "pervasive monitoring" to prevent the government from indoctrinating religion.  *See Agostini*, 521 U.S. at 233.  RLUIPA does not call on the government to supervise land use regulations to make sure governmental funds do not sponsor religious practice, nor does it require state or local officials to develop expertise on religious worship or to evaluate the merits of different religious practices or beliefs.  RLUIPA requires only that states avoid discriminating against or among religious institutions.  As such, RLUIPA passes muster under *Lemon*'s third prong.

That the Constitution's prohibition of the "establishment of religion" also allows – and sometimes mandates – equal treatment of religion seems obvious. Equal treatment maintains the separation of church and state by keeping the government separate from people's decisions about religion, while ensuring that the government does not "make [] adherence to religion relevant to a person's standing in the political community."  *Wallace*, 472 U.S. at 69 (O'Connor, J., concurring in judgment); *see also Kiryas Joel*, 512 U.S. at 715 (O'Connor, J.,

concurring in part and concurring in judgment); *County of Allegheny v. ACLU*, 492 U.S. 573, 626 (1989) (O'Connor, J., concurring in part and concurring in judgment). Because RLUIPA accommodates religion by remedying and preventing discriminatory zoning in accordance with principles established by the First and Fourteenth Amendments, RLUIPA does not violate the Establishment Clause.[20]

D.      Tenth Amendment

Finally, we reject the argument that in enacting RLUIPA, Congress violated the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. Although

---

[20] Surfside's argument that RLUIPA violates the Establishment Clause echoes Justice Stevens' concurring opinion in *Boerne*, which indicated his belief that RFRA violated the Establishment Clause because the statute "provided the Church with a legal weapon that no atheist or agnostic can obtain." *Boerne*, 521 U.S. at 536-37 (Stevens, J., concurring). Many circuits have held that RFRA continues to apply to the federal government. *See Kikumura v. Hurley*, 242 F.3d 950, 959-60 (10th Cir. 2001); *In re Young*, 141 F.3d 854, 863 (8th Cir. 1998); *Mockaitis v. Harcleroad*, 104 F.3d 1522, 1530 (9th Cir. 1997); *Sasnett v. Sullivan*, 91 F.3d 1018, 1022 (7th Cir. 1996), *vacated on other grounds*, 521 U.S. 1114 (1997); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 470 (D.C. Cir. 1996); *Flores v. City of Boerne*, 73 F.3d 1352, 1364 (5th Cir.1996), *rev'd on other grounds*, 521 U.S. 507 (1997). While we have not had occasion to decide this question for ourselves, the implication is that if RFRA were constitutionally infirm on Establishment Clause grounds as applied to the states, there would be no principled way to exempt the federal government from the same infirmity. Although we are evaluating RLUIPA's equal terms provision, which, unlike the substantial burden provision, does not have roots in RFRA, we note that the *Boerne* majority declined to adopt Justice Stevens' view of the Establishment Clause.

RLUIPA intrudes to some degree on local land use decisions, RLUIPA does not violate principles of federalism if it is otherwise grounded in the Constitution. *See New York v. United States*, 505 U.S. 144, 156 (1992). Because RLUIPA is a proper exercise of Congress's power under § 5 of the Fourteenth Amendment, there is no violation of the Tenth Amendment.

Moreover, RLUIPA must not "compel the States to enact or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997); *New York*, 505 U.S. at 175-77, 188. While RLUIPA may preempt laws that discriminate against or exclude religious institutions entirely, it leaves individual states free to eliminate the discrimination in any way they choose, so long as the discrimination is actually eliminated. *See Fed. Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 759 (1982) ("[T]he Federal government may displace state regulation even though this serves to 'curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important.") (citation omitted); *City of Rome v. United States*, 446 U.S. 156, 179 (1980) (contemplating Fourteenth Amendment's interference with state rights); *Gregory v. Ashcroft*, 501 U.S. 452, 468 (1991) (same).

RLUIPA's core policy is not to regulate the states or compel their enforcement of a federal regulatory program, but to protect the exercise of

59

religion, a valid exercise of Congress's § 5 power under the Fourteenth Amendment, which does not run afoul of the Tenth Amendment's protection of the principles of federalism.

## Conclusion

For the foregoing reasons, we find that § 90-152 of the SZO violates § (b)(1) of RLUIPA. We **REVERSE** the decision of the district court, and **REMAND** for further proceedings consistent with this opinion.