BOGGS, J., delivered the opinion of the court in which SUHRHEINRICH, J., joined, and WHITE, J., joined in part. WHITE, J. (pp. 373-82), delivered a separate opinion concurring in part and dissenting in part.
OPINION
BOGGS, Circuit Judge.
Defendant-Appellee Upper Arlington (the government), a suburb of Columbus, Ohio, regulated the use of land owned by Plaintiff-Appellant Tree of Life Christian Schools (TOL Christian Schools). As a result of this regulation, TOL Christian Schools could not use its land to operate a religious school. TOL Christian Schools, after corresponding with and applying to the government on related proposals, applied to rezone the property to allow use as a religious school. The government denied the application because such a use would not accord with certain aspects of the government’s Master Plan. In its denial, the government focused on the Master Plan’s provision that the government maintain zoning for commercial uses in order to maximize its income-tax revenue.
After the denial, TOL Christian Schools filed this suit. The suit primarily claims, under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc — 2000cc-5, that the government illegally failed to treat TOL Christian Schools on equal terms with nonreligious assemblies or institutions. After both parties moved for summary judgment, the district court granted summary judgment to the government. This was error.
Although the record in this case is complex, we can summarize our view briefly. TOL Christian Schools purchased the largest office building in Upper Arlington, unused at the time of the purchase, and attempted to negotiate with the government to open a religious school. The government refused to strike a deal with TOL Christian Schools in hopes, apparently unfounded, that the property’s former occupant, AOL/Time Warner (or its equivalent), would- return. Such a result, the government officials further hoped, would mark the first step in a plan to increase services by increasing personal-income-tax revenues without allowing multifamily, retail, or commercial use of land currently *367 zoned for only single-family residential use.
Anticipating controversies similar to this one, and affirming its commitment to protecting religious freedom, Congress enacted RLUIPA, which provides, among other things, that “[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.” 42 U.S.C. § 2000cc(b)(l). Different circuits interpret this provision differently. Some circuits have held that a land-use regulation must treat “similarly situated” religious and nonreligious assemblies and institutions equally. The Eleventh Circuit has held that a government land-use regulation that discriminates against a religious assembly or institution in comparison to any nonreligious assembly or institution is invalid unless it is narrowly tailored to achieve a compelling government interest.
Under any approach, the issue in this case is whether the government treats nonreligious assemblies or institutions that would fail to maximize income-tax revenue in the same way it has treated the proposed religious school. That is a factual, not a legal, question. Federal courts may not resolve genuine issues of material fact on motions for summary judgment, even in proceedings for equitable relief. So, the district court’s grant of summary judgment to the government was error. We reverse the judgment of the district court and remand. We explain more fully our reasoning below.
I
In 2009, AOL/Time Warner, a media company not party to this litigation, vacated an office building located at 5000 Arlington Centre Boulevard in Upper Arlington. The same year, TOL Christian Schools, a school with several campuses across the Columbus area supported by local churches, began negotiations that would conclude in August 2010 with its purchase of the property at 5000 Arlington Centre Boulevard.
Upper Arlington is a primarily residential suburb. It has assembled various land-use and economic regulations in the Unified Development Ordinance (UDO). The UDO zones Upper Arlington. The UDO provides for seven criteria to “be followed in approving zoning map amendments to the UDO.” UDO § 4.04(C). One of those criteria provides “[t]hat the proposed zoning district classification and use of the land will generally conform with the master plan.” Id. § 4.04(C)(5).
The Master Plan focuses on regulating uses of land in order to increase the government’s income-tax revenues. For this reason, it emphasizes the importance of using certain non-residential land as office space.[1] The government theorized that such land use will attract high-income professionals, whose income the government can tax. The zone for office use, under the UDO, is the “ORC Office and Research District” (ORC District). According to the UDO, the purpose of the ORC District is
to allow offices and research facilities that will contribute to the City’s physical pattern of planned, healthy, safe, and attractive neighborhoods. The ORC *368 district should also provide job opportunities and services to residents and contribute to the City’s economic stability. Permitted uses in the ORC district are: business and professional offices, research and development, book and periodical publishing, insurance carriers, corporate data centers, survey research firms, outpatient surgery centers, [and] hospitals....
UDO § 5.03(A)(6). The ORC District includes 5000 Arlington Centre Boulevard.
Extended negotiation between TOL Christian Schools and the government preceded this case. On January 5, 2011, after negotiations had failed, TOL Christian Schools filed this federal case, alleging that Upper Arlington had violated RLUIPA’s Equal Terms Provision, and seeking in-junctive relief. After procedural developments in this case, including a previous appeal to this court, not now relevant, TOL Christian Schools “submitted a[n] ... application to the [Government] to rezone its property .... from ORC Office and Research District to residential,” in which zone the government allows land to be used for schools, religious or otherwise. Tree of Life Christian Schs. v. City of Upper Arlington, 16 F.Supp.3d 883, 892 (S.D.Ohio 2014) (emphasis added). In response to this zoning amendment that TOL Christian Schools proposed, the government’s senior planning officer, Chad Gibson, reported to the City Council that he
believe[d] that the proposed rezoning is in direct opposition to numerous core master plan goals and objectives. The proposed zoning change would eliminate nearly 16 acres of extremely limited ORC-zoned ground, which will reduce the amount of office and research space within the City.... [A ]pproving such a rezoning would be contrary to the City’s long-term financial interests.
Chad Gibson, Staff Report to Upper Arlington City Council (Nov. 25, 2013) (emphasis added). In addition, the City Attorney spoke to the City Council, focusing on the fact “that rezoning to eliminate commercially zoned property would be contrary to the master plan.” Tree of Life Christian Schs., 16 F.Supp.3d at 892. Based on Gibson’s report and the City Attorney’s comments, “the Council denied [TOL Christian Schools]’s rezoning request” on December 9, 2013. Ibid.
On February 11, 2014, TOL Christian Schools moved for summary judgment on its claims in the district court. On March 6, 2014, Upper Arlington submitted both a memorandum opposing the motion of TOL Christian Schools and a cross-motion for summary judgment. On April 18, 2014, the district court granted summary judgment to the government, reasoning along the lines of Gibson’s report. TOL Christian Schools timely appealed.
II •
A
As a general matter, municipalities regulate land use. The federal government, by contrast, generally does not regulate local land use. But Congress has long concerned itself with the protection of religious freedom. As the Department of Justice has observed,
despite the guarantee of religious freedom in our founding documents, individuals and groups have faced discrimination based on religion throughout our history. And throughout our history, Congress and the federal government have repeatedly acted to protect Americans from such discrimination....
For example, while it was passed largely in response to ongoing racial tensions, the landmark Civil Rights Act of 1964 included religion along with race *369 ... as categories in which persons are protected against discrimination in a host of areas....
U.S. Dep’t of Justice, Report on the Tenth Anniversary of the Religious Land Use and Institutionalized Persons Act 1 (Sept. 22, 2010).
“RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens.... ” Cutter v. Wilkinson, 544 U.S. 709, 714, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). In 1993, Congress enacted the Religious Freedom Restoration Act (RFRA). Congress sought to justify RFRA’s regulation of states by its Fourteenth Amendment power to enforce the First Amendment. But, the Supreme Court held, “Congress had exceeded” its authority to “enforce constitutional rights pursuant to § 5 of the Fourteenth Amendment” when it endeavored to. “defin[e] those rights instead of simply enforcing them.” Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1236 (11th Cir.2004) (emphasis omitted) (discussing City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). Because, in the Supreme Court’s view, “RFRA contradicted] vital principles necessary to maintain separation of powers and the federal balance,” the Court held that RFRA, as applied to the states, was unconstitutional. City of Boerne, 521 U.S. at 536, 117 S.Ct. 2157.
After City of Boeme, Congress passed RLUIPA. RLUIPA, “enacted under Congress’s Commerce and Spending Clause powers, imposes the same general test as RFRA but on a more limited category of governmental actions.” Burwell v. Hobby Lobby Stores, Inc., — U.S. —, 134 S.Ct. 2751, 2761, 189 L.Ed.2d 675 (2014).[2] By enacting RLUIPA, Congress directed federal courts to scrutinize municipal land-use regulations that function to exclude disfavored religious groups like TOL Christian Schools. “RLUIPA’s land-use sections provide important protections for the religious freedom of persons, places of worship, religious schools, and other religious assemblies and institutions.” U.S. Dep’t of Justice, supra at 4 (emphasis added).
RLUIPA protects land use as religious exercise in several ways. For example, it limits government’s ability to impose a land-use regulation “that imposes a substantial burden on” religious exercise. 42 U.S.C. § 2000cc(a)(l). In addition, RLUI-PA prohibits land-use regulation that “discriminates against any assembly or institution on the basis of religion,” id. § 2000cc(b)(2), or “unreasonably limits religious assemblies, institutions, or structures within a jurisdiction,” id. § 2000ec(b)(3)(B). The RLUIPA provision at issue here, often called the Equal Terms Provision, provides that “[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.” Id. § 2000cc(b)(l).
B
All of our sister circuits that have interpreted the Equal Terms Provision have glossed the statutory language in a way *370 that allows defendant governments some safe harbor for permissible land-use regulation. But they disagree about the “nonreligious assembly or institution” whose treatment by the government should be compared with the government’s treatment of a religious assembly or institution.
The Eleventh Circuit’s test in Midrash Sephardi, Inc. v. Town of Surfside is the oldest and most plaintiff-friendly. 366 F.3d 1214 (11th Cir.2004). The Eleventh Circuit begins with a literal reading of the Equal Terms Provision’s language: A valid comparator could be any nonreligious assembly or institution. It is this understanding of what is a comparator, i.e., which secular land users are similarly situated to a religious assembly or institution, that is so plaintiff-friendly. To compensate, and as an off-setting consideration, the Eleventh Circuit borrows from the Supreme Court’s Free Exercise jurisprudence a striet-scrutiny analysis: a land-use regulation does not violate the Equal Terms Provision if it is narrowly tailored to further a compelling government interest.
Other circuits, by contrast, require that a comparator be “similarly situated” to the plaintiff religious assembly or institution with regard to the regulation at issue or to its purpose. For instance, the Third Circuit restricts comparison to “secular assemblies or institutions that are similarly situated [to the religious assembly] as to the regulatory purpose.” Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch, 510 F.3d 253, 266 (3d Cir.2007). The Second Circuit compares the plaintiff religious assembly to a nonreligious assembly “similarly situated for all functional intents and purposes of the regulation.” Elijah Grp., Inc. v. City of Leon Valley, 643 F.3d 419, 423 (5th Cir.2011) (internal quotation marks omitted) (discussing Third Church of Christ, Scientist, of N.Y.C. v. City of New York, 626 F.3d 667 (2d Cir.2010)); see also Elijah Grp., Inc., 643 F.3d at 422-24 (describing how the various tests using “similarly situated” language differ, while declining to choose among them).[3]
We need not definitively choose among the various tests used by other circuits in order to resolve this case. Granting summary judgment to the government is erroneous under any test, because “summary judgment must be denied in a proceeding for equitable relief ... where genuine issues of material fact exist.” Hasan v. Clevetrust Realty Inv’rs, 729 F.2d 372, 374 (6th Cir.1984); cf. Hess v. Schlesinger, 486 F.2d 1311, 1313 (D.C.Cir.1973) (holding that, when a plaintiff seeking an injunction raises a genuine issue of fact material to the defendant government’s claim regarding its justification for a policy, summary judgment is inappropriate); Windsurfing *371 Int’l, Inc. v. Ostermann, 534 F.Supp. 581 (S.D.N.Y.1982) (holding that, where defendant’s assertion depends on proof to be offered at trial, summary judgment is inappropriate).
Ill
Do TOL Christian Schools and the government genuinely dispute whether the government treated more favorably any other assembly or institution that, like TOL Christian Schools, failed to maximize the government’s income? The government’s current zoning law allows (in fact, encourages) nonreligious assemblies or institutions to use 5000 Arlington Centre Boulevard: businesses most obviously, but also nonprofit organizations such as hospitals, outpatient care centers, and daycare centers.[4]
The government does not deny that the UDO would allow these other assemblies or institutions to use 5000 Arlington Centre Boulevard.[5] So the remaining question is whether these other assemblies or institutions, treated more favorably, are similarly situated. TOL Christian Schools has pled facts sufficient to allege that at least some of these assemblies or institutions are situated, relative to the government’s regulatory purpose, similarly to TOL Christian Schools, i.e., they would fail to maximize income-tax revenue. See Verified Compl. ¶¶ 60-65 (identifying permitted uses of child day care centers, hotels/motels, hospitals, outpatient surgery centers, and business and professional offices). These allegations create a genuine issue of fact as to whether the government treats more favorably assemblies or institutions similarly situated with respect to maximizing revenue, unless the government can demonstrate that no assemblies or institutions could be similarly situated.
The religious land use that TOL Christian Schools proposes is, we assume without deciding, deleterious to the purpose of the regulation at issue (which we assume to be increasing income-tax revenue). But the nonreligious uses that the government concedes it would allow seem to be similarly situated to the regulation. Indeed, the comparisons that the government invites seem to compel the opposite conclusion, even on casual review.
For instance, the government suggested at oral argument that it would prefer that 5000 Arlington Centre Boulevard be used for an ambulatory care center or outpatient surgery center. But we cannot as *372 sume as a fact, and the government certainly has offered no evidence to show, that an ambulatory care center (or an outpatient surgery center, or a data and call center, or office space for a not-for-profit organization, or a daycare) would employ higher-income workers than TOL Christian Schools would (or result in less traffic or even in less outdoor noise, each an alternative rationale at one point proffered by the government for refusing TOL Christian Schools’s application). The dissent engages in a vigorous factual analysis of these factors, but they are genuine issues of material fact that cannot be resolved on summary judgment. As such, the district court’s grant of summary judgment to the government was error.
We remand to the court below to answer remaining questions of fact: Are there nonreligious assemblies or institutions to which the court should compare Tree of Life Christian Schools because they would fail to maximize income-tax revenue, and if so, would those assemblies or institutions be treated equally to TOL Christian Schools?
TV
Our obligation is to apply the statute enacted by Congress. We cannot contort its meaning. Under any of our sister circuits’ tests, RLUIPA does not allow the government to treat more favorably land uses that, like TOL Christian Schools, fail to maximize the government’s income-tax revenue. The standard for judgment is objective: Are other assemblies similarly situated or are they not? It is not for us to decide this question, because the question is factual. Taking that position does not imply our acceptance of the Eleventh Circuit’s strict-scrutiny standard. Nor does it imply intermediate scrutiny or rational basis. These standards of legal review and their attendant arguments do not apply at this stage in the litigation.
For instance, the government claims that TOL Christian Schools can locate elsewhere in 95% of the land that exists in Upper Arlington. That claim, perhaps relevant to the intermediate-scrutiny defense of “other means,” has no application here. The Equal Terms Provision forbids a locality from discriminating against religious institutions and assemblies, regardless of time, place, and manner. In other words, it is not a defense that a government discriminates against religious assemblies and institutions only in part, rather than all, of its jurisdiction.[6] Even the government’s proffered rational basis for its regulation — we want A, we think land use B leads to A, thus we regulate to privilege land use B — does not satisfy RLUIPA’s test.
Finally, we observe that the government could ensure commercial use of the property at issue without violating the federal statute.[7] Using eminent domain, Upper *373 Arlington could force TOL Christian Schools to sell the land to the government, and sell the land to a buyer that the government thinks offers superior economic benefits. See Kelo v. City of New London, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005); see also Christopher Serkin & Nelson Tebbe, Condemning Religion: RLUIPA and the Politics of Eminent Domain, 85 Notre Dame L. Rev. 1, 53 (2009) (arguing that eminent domain “provides local governments with an escape hatch to avoid the most severe applications of RLUIPA’s zoning provisions”). But the city has not committed government funds to the theory that a traditional commercial office tenant — as yet unidentified — both could be attracted to use the land and also, if attracted, would increase tax revenues. Instead, they have placed the cost on TOL Christian Schools — perhaps to save the upfront cost of compensating an exercise of eminent domain, perhaps because there is no market for office space in Upper Arlington, and perhaps to exclude an unfamiliar or disfavored religious assembly.
V
TOL Christian Schools claims that Upper Arlington has violated its constitutional rights to equal protection and free exercise.[8] These claims are incorrect. Because facially neutral statutes such as the UDO might survive rational-basis review under the Equal Protection Clause and Free Exercise Clause,[9] Congress established enhanced protections for religious assemblies against land-use regulations. We apply RLUIPA by its statutory terms and find a genuine issue of material fact as to its applicability.
In conclusion, because we hold that there is a genuine issue of material fact as to the applicability of RLUIPA’s Equal Terms Provision, we REVERSE the judgment of the district court, and REMAND for further proceedings.

. The government implies that the Master Plan’s purpose is straightforward and unitary. We assume as much without deciding. But we note that, even on the few pages of the Master Plan submitted in the record, it might be possible for reasonable minds to derive from the Master Plan’s language different understandings of what uses conform. Such difference would make consistent compliance with the relevant UDO provisions difficult indeed.

. Unlike RFRA, "RLUIPA, in an obvious effort to effect a complete separation from First Amendment case law,” Burwell v. Hobby Lobby Stores, Inc., 6th Cir. - U.S. -, 134 S.Ct. 2751, 2761-62, 189 L.Ed.2d 675, omitted “the reference to the First Amendment,” id. at 2762, that was present in RFRA. In addition, RLUI-PA provides that it “shall be construed in favor of a broad protection of religious exercise....” 42 U.S.C. § 2000cc-3(g). The Court has acknowledged that the phrase " ‘exercise of religion,' as it appears in RLUIPA, must be interpreted broadly...." Hobby Lobby, 134 S.Ct. at 2762 n. 5.

. The Seventh Circuit observed that the Third Circuit’s "use of 'regulatory purpose' as a guide to interpretation” presents several practical problems. River of Life Kingdom Ministries v. Vill. of Hazel Crest, 611 F.3d 367, 371 (7th Cir.2010) (en banc). The regulatory-purpose test:
(1) "invites speculation concerning the reason behind the exclusion of churches”;
(2) "invites self-serving testimony by zoning officials and hired expert witnesses”;
(3) "facilitates zoning classifications thinly disguised as neutral but actually systematically unfavorable to churches”; and
(4)"makes the meaning of 'equal terms’ in a federal statute depend on the intentions of local government officials.”

Ibid.

Nonetheless, the Seventh Circuit adopted a test closer to that of the Second, Third, and Fifth Circuits than that of the Eleventh, although it “shift[ed] focus from regulatory purpose to accepted zoning criteria." Ibid.; see also Centro Familiar Cristiano Buenas Nuevas v. City of Yuma, 651 F.3d 1163, 1172-73 (9th Cir.2011) (following the Seventh- Circuit's "accepted zoning criteria” test).

. The UDO formerly allowed daycares as permitted uses in ORC Office and Residential District. Upper Arlington chose, during the pendency of the litigation, to exclude daycares from the ORC District. See Ordinance 52-2011. But "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case.” Ohio Citizen Action v. City of Englewood, 671 F.3d 564, 583 (6th Cir.2012) (quoting Friends of the Earth, Inc. v. Laidlaw Envt’l Servs. (TOC), Inc., 528 U.S. 167, 174, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)); see also Ohio Citizen Action, 671 F.3d at 583 (observing that "the defendant bears ‘the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur” (quoting Friends of the Earth, 528 U.S. at 190, 120 S.Ct. 693)). Here, the removal of daycares from the zone, absent an injunction that would prevent their permitting, would not remedy the alleged problem; Upper Arlington always could amend the UDO once again to allow daycares in the ORC district. See Gibson Depo., R. 55 at 66 (explicitly admitting that Upper Arlington could return to the earlier UDO at any time).

. A government's small size or general anti-development regulations or political culture cannot protect it from valid RLUIPA claims on motions for summary judgment: A government's regulatory system that provides for unequal treatment violates RLUIPA even if no practical comparator has arisen.

. Just because regulations do not prevent a particular and protected use does not mean that such a use is factually possible. Here, the government points to the zoning of much of its land for residential use, where it allows owners to use land for schooling, religious or otherwise. But it may be functionally impossible for a school such as TOL Christian Schools to purchase and amalgamate such land, which could belong to many private owners.

. We reiterate that we assume without deciding that Upper Arlington’s stated policy goal — regulating the use of land in order to maximize income-tax revenue — both reflects the essence of the statutory language and also presents no legal problems by itself, although some courts have found regulations of land use solely for the purpose of maximizing the local-government's tax revenues to be arbitrary and unreasonable. See, e.g., Mindel v. Twp. Council of Twp. of Franklin, 167 N.J.Super. 461, 400 A.2d 1244 (NJ.Super.Ct.Law *373 Div.1979). We hold only that the regulatory scheme employed to affect that goal may violate RLUIPA and the facts disputed are material to the question of whether there has been a violation. ■

. TOL Christian Schools initially complained of violations of the Ohio Constitution, see Verified Compl. ¶¶ 167-73, but did not brief the issue on appeal, so we do not consider it.

. See Emp’t Div., Dep’t of Human Res. of Ore. v. Smith, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).