THAPAR, Circuit Judge, dissenting.
Since the founding of this nation, religious groups have been able to "sit in safety under [their] own vine and figtree, [with] none to make [them] afraid." Letter from George Washington to the Hebrew Congregation in Newport, R.I. (Aug. 18, 1790). In keeping with that promise over two hundred years later, Congress enacted the Religious Land Use and Institutionalized Persons Act (RLUIPA) to protect religious groups from discriminatory zoning laws. But the courts have forgotten this country's sacred vow and failed to give RLUIPA the effect its written text demands. Now our circuit does the same. I respectfully dissent.
I.
"[A] page of history is worth a volume of logic." N.Y. Trust Co. v. Eisner , 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921). And the history of exclusionary zoning is sordid. Initially, the practice came about when local officials sought to divide land into districts with specific uses. But "[w]hat began as a means of improving the blighted physical environment ... became a mechanism for protecting property values and excluding the undesirables." Christopher Silver, The Racial Origins of Zoning in American Cities , in Urban Planning and the African American Community: In the Shadows (June Manning Thomas & Marsha Ritzdorf eds., Sage Publications 1997) (internal quotation marks omitted) (quoting noted urban planner Yale Rabin). At first, municipalities passed zoning codes that discriminated on their face. Buchanan v. Warley , 245 U.S. 60, 70-71, 38 S.Ct. 16, 62 L.Ed. 149 (1917). But the Supreme Court struck those down. Id. at 82, 38 S.Ct. 16. So local officials employed more covert methods in the hope of evading scrutiny. Rather than saying "no blacks allowed," zoning ordinances instead imposed minimum-size house requirements and excluded mobile homes and multiple-dwelling units in certain districts. Andrew H. Whittemore, The Experience of Racial and Ethnic Minorities with Zoning in the United States , 32 J. of Planning Lit. 16, 19 (2017). These ordinances effectively kept racial minorities out of "whites-only" neighborhoods. See id.
*377 But because municipalities cloaked these ordinances with neutral, bureaucratic concerns-such as noise, traffic, and taxable income-the courts largely upheld them. Village of Euclid v. Ambler Realty Co. , 272 U.S. 365, 394, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (concluding that a municipality could exclude apartment buildings because they would destroy the "residential character of the neighborhood").
So in 1968, Congress stepped in and passed the Fair Housing Act to prevent municipalities from basing land-use laws on race, national origin, color, or familial status. 42 U.S.C. § 3604 ; see also Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Cmtys. Project, Inc. , --- U.S. ----, 135 S.Ct. 2507, 2525, 192 L.Ed.2d 514 (2015) (holding that disparate-impact claims are cognizable under the Fair Housing Act). Courts could no longer countenance neutral language masking discriminatory zoning codes.
Within a matter of years, however, other discriminatory zoning practices surfaced-this time aimed at religious groups. Sometimes the discrimination was overt. For example, when a Jewish group in Ohio submitted a land-use proposal, an objector at the subsequent zoning hearing told them: "Hitler should have killed more of you." H.R. Rep. No. 106-219, at 23 (1999). Similarly, a Pentecostal group that applied for a zoning permit heard in response: "Let's keep these God damned Pentecostals out of here." Id. Other cases featured more subtle bias. As they had done with racial minorities, municipalities clothed their objections to religious organizations with the same ordinary concerns: traffic, noise, and lost tax revenue. 146 Cong. Rec. 16,698 (2000) (joint statement of Senators Orrin Hatch and Ted Kennedy noting that "often, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or not consistent with the city's land use plan' ") (hereinafter Joint Statement). Instead of saying "no Muslims allowed," city planners complained of the traffic on Fridays when Muslims gathered to pray. Emma Green, The Quiet Religious-Freedom Fight That Is Remaking America , The Atlantic (Nov. 5, 2017), https://www.theatlantic.com/politics/archive/2017/11/rluipa/543504/; see also H.R. Rep. No. 106-219, at 23 ("[L]and-use regulators often refuse permits for Orthodox synagogues because they do not have as many parking spaces as the city requires for the number of seats.").
These mundane justifications were as effective in excluding religious groups as they were racial minorities. An ordinance based on traffic, for instance, prohibited churches because they generated too much traffic for a residential area but not enough traffic for a commercial area. Joint Statement at 16,698. As a result, "[z]oning codes frequently exclude[d] churches in places where they permit[ted] theaters, meeting halls, and other places where large groups of people assemble for secular purposes." Id. And when religious assemblies challenged these ordinances, the courts offered no relief, often upholding the laws because the government had "good reason" to exclude the religious. See, e.g. , Christian Gospel Church, Inc. v. City of San Francisco , 896 F.2d 1221, 1223-26 (9th Cir. 1990) (upholding a zoning denial for a church); Grosz v. City of Miami Beach , 721 F.2d 729, 731-32, 741 (11th Cir. 1983) (upholding a zoning law that prohibited "organized, publicly attended religious services"); see also First Assembly of God of Naples, Fla., Inc. v. Collier Cty. , 20 F.3d 419, 420, 424 (11th Cir. 1994) (upholding zoning ordinance that permitted a church but denied its attached homeless shelter).
Recognizing these problems, Congress stepped in once more and unanimously *378 enacted the Religious Land Use and Institutionalized Persons Act (RLUIPA) to prevent municipalities from excluding religious assemblies or institutions-either overtly or covertly. Joint Statement at 16,698 ("Churches ... are frequently discriminated against on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation."). In doing so, Congress extensively documented the discrimination that RLUIPA targeted. See River of Life Kingdom Ministries v. Village of Hazel Crest , 611 F.3d 367, 378-80 (7th Cir. 2010) (en banc) (Sykes, J., dissenting) (describing the history behind RLUIPA); Sarah Keeton Campbell, Note, Restoring RLUIPA's Equal Terms Provision, 58 Duke L.J. 1071, 1079-85 (2009) (discussing the legislative record behind RLUIPA). Congress's attempt to address religious discrimination, however, has not been as effective. That fault lies not with Congress, but with the courts, which have added requirements into RLUIPA that prevent many religious groups from seeking the shelter that Congress sought to provide. Today, our circuit joins a host of others that have improperly written new demands into the statute's "Equal Terms" provision-to which I now turn.
II.
When interpreting a statute, we always start with its terms. E.g. , Advocate Health Care Network v. Stapleton , --- U.S. ----, 137 S.Ct. 1652, 1658, 198 L.Ed.2d 96 (2017). And the Equal Terms provision is plain: "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). The statute thus requires a plaintiff bringing a claim to prove four elements: (1) the plaintiff is a religious assembly or institution, (2) subject to a land use regulation, (3) that, compared with a nonreligious assembly or institution, (4) treats the plaintiff on less than equal terms. Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty. , 450 F.3d 1295, 1307 (11th Cir. 2006). Because, as in this case, the first two elements are usually easily proven, I elaborate only on the third and fourth.
a. Nonreligious Assemblies or Institutions
All Equal Terms cases involve a comparison between a religious entity and a nonreligious entity. And Congress selected those entities for us: "assemblies" and "institutions." 42 U.S.C. § 2000cc(b)(1) ; see Midrash Sephardi, Inc. v. Town of Surfside , 366 F.3d 1214, 1230-31 (11th Cir. 2004). But what are "assemblies" and "institutions"? Because the statute does not define those terms, courts must look to their natural and ordinary meaning. FDIC v. Meyer , 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) ; Midrash Sephardi , 366 F.3d at 1230 ; see generally Oliver Wendell Holmes, The Theory of Legal Interpretation , 12 Harv. L. Rev. 417 (1899).
An "assembly" is "[a] group of persons gathered together for a common reason." American Heritage Dictionary of the English Language (4th ed. 2000); see also Webster's Encyclopedic Unabridged Dictionary of the English Language (1996) (defining assembly as "a group of persons gathered together, usually for a particular purpose, whether religious, political, educational, or social"). And that group of people typically has a degree of "affinity, organization, and unity around [that] common purpose." River of Life , 611 F.3d at 390 (Sykes, J., dissenting). Take a health club. People gather there for "exercise and athletic classes of various kinds, as well as *379 sports and social-club meetings and team competitions." Id.
An "institution," on the other hand, is "[a]n established organization or foundation, especially one dedicated to education, public service, or culture." American Heritage Dictionary of the English Language (4th ed. 2000); see also Black's Law Dictionary (7th ed. 1999) (defining "institution" as "[a]n established organization, esp. one of a public character, such as a facility for the treatment of mentally disabled persons"). Institutions differ from assemblies, then, in their degree of formality and the nature of their mission-serving the common good. Your local museum, legal aid services, or even the Girl Scout headquarters would all count as institutions.
By using such unambiguous and well-understood words, Congress made our job easy. Nevertheless, some courts have added a gloss onto this part of the statute. Rather than simply asking whether a nonreligious entity qualifies as an "assembly" or "institution," they have required plaintiffs to further show that the assembly or institution is also "similarly situated."[1] Third Church of Christ , 626 F.3d at 668 ; River of Life , 611 F.3d at 371 ; Lighthouse Inst. , 510 F.3d at 266. This gloss imposes a heightened pleading burden on the plaintiff.
There is one problem: Congress did not enact that burden. The Equal Terms provision prohibits local governments from treating a religious assembly or institution on less than equal terms than a "nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). "Similarly situated" appears nowhere in that mandate. And it is not for courts to assume that Congress meant something other than what it said. Caminetti v. United States , 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain ... the sole function of the courts is to enforce it according to its terms."). Congress knew about "similarly situated" standards from the Equal Protection context and chose not to incorporate them into RLUIPA. Peter T. Reed, Note, What Are Equal Terms Anyway? , 87 Notre Dame L. Rev. 1313, 1334 (2012) ; see Midrash Sephardi , 366 F.3d at 1229 ("[W]hile [the Equal Terms provision] has the 'feel' of an equal protection law, it lacks the 'similarly situated' requirement usually found in equal protection analysis."). And it is beyond our court's power to write standards into legislation, even if we think that the law would benefit as a result. Judges are not entrusted with the job of writing (or rewriting) statutes. Nor am I aware of an "add-a-gloss" canon that allows a court to circumvent its defined role when it suits us. While the majority cites Marbury v. Madison , 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), for the proposition that courts can read words into statutes, Marbury commands the exact opposite. Courts say what the law is , not *380 what the law should be . Id. ; see The Federalist No. 78, at 526 (Alexander Hamilton) (J. Cooke ed., 1961) ("The courts must declare the sense of the law; and if they should be disposed to exercise will instead of judgment, the consequence would equally be the substitution of their pleasure to that of the legislative body."). Congress gave us a plain text, and basic principles of statutory interpretation compel that we apply it as written.[2] Henson v. Santander Consumer USA Inc. , --- U.S. ----, 137 S.Ct. 1718, 1725, 198 L.Ed.2d 177 (2017) ("[W]hile it is of course our job to apply faithfully the law Congress has written, it is never our job to rewrite a constitutionally valid statutory text ....").
Moreover, even if the plain text of the Equal Terms provision were not enough, Congress told us in the statute how to interpret the text. Congress explicitly stated that courts are to "construe the statute in favor of a broad protection of religious exercise, to the maximum extent permitted." 42 U.S.C. § 2000cc-3(g). This instruction should give courts pause about divining a "similarly situated" requirement into the Equal Terms provision. Yet courts that have applied the "similarly situated" gloss have done so because they believed the plain meaning was "overbroad."[3] E.g. , *381 River of Life , 611 F.3d at 370 ; Lighthouse Inst. , 510 F.3d at 268 (noting that under a plain meaning analysis, an ordinance that permitted a book club would also have to permit a "religious assembly with rituals involving sacrificial killings of animals"). Congress can only tell the courts what a statute means in so many ways. And when its legislatively-enacted instructions reinforce the plain meaning of the words it used, courts ought to listen. See Yates , 135 S.Ct. at 1101 (Kagan, J., dissenting) ("If judges disagree with Congress's choice, we are perfectly entitled to say so-in lectures, in law review articles, and even in dicta. But we are not entitled to replace the statute Congress enacted with an alternative of our own design.").
So long as a plaintiff can point to a nonreligious "assembly" or "institution," the plaintiff satisfies the third element. See 42 U.S.C. § 2000cc(b)(1) (requiring comparison with a "nonreligious assembly or institution"). The text requires nothing more. Neither should courts.
b. "Less Than Equal Terms"
Once the plaintiff has identified assemblies and institutions, it must then show that the challenged law treats the religious ones on "less than equal terms" than the nonreligious ones. When Congress adopted the Equal Terms provision, it did so amidst contentious interpretations of the Free Exercise Clause. River of Life , 611 F.3d at 380, 378-80 (Sykes, J., dissenting). Most circuits that have reached the issue agree that this background jurisprudence shows that a law can treat religious groups on "less than equal terms" in three ways. Primera Iglesia , 450 F.3d at 1308.
Facial inequality . First, a plaintiff can show less than equal treatment if the law treats religious assemblies or institutions differently than nonreligious assemblies or institutions by its very terms. Consider an ordinance that permits social clubs but prohibits churches and synagogues. Midrash Sephardi , 366 F.3d at 1220. The nonreligious assemblies get in. The religious ones do not. The ordinance thus facially treats religious assemblies-churches and synagogues-on less than equal terms than nonreligious assemblies-social clubs. That is the disparate treatment that the Equal Terms provision prohibits. Id. at 1231.
Gerrymandered inequality . A plaintiff can also show less than equal treatment if the law in question, while facially neutral, nonetheless targets religion through a "religious gerrymander." Primera Iglesia , 450 F.3d at 1309 (quoting Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah , 508 U.S. 520, 535, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ). This occurs when the law separates permissible uses in a way that burdens "almost only" religious groups. Id. Imagine a law that bans all steeples on buildings. On its face, the law looks neutral. No building, religious or secular, can have a steeple. But if a plaintiff can show that the ban "almost only" targets religious assemblies because only religious buildings have steeples, then the plaintiff has successfully demonstrated that the law treats religious assemblies on "less than equal terms."
As-applied/selective inequality . Finally, a plaintiff can show less than equal treatment if the government selectively applies a facially-neutral law in a way that excludes religious assemblies or institutions. River of Life , 611 F.3d at 383 (Sykes, J., dissenting). Since the statutory terms do not make a distinction, courts have to look at whether the comparators actually received different treatment. Consider, for instance, an ordinance banning all assembly halls that can hold more than 500 members. A megachurch with over 500 members applies for a zoning exception, *382 and the city denies the request. But then an over-sized book club applies for an exception that the city grants. This time, the city has "implemented" the ordinance in a way that treats religious assemblies on "less than equal terms" than nonreligious assemblies. The city granted an exception to a nonreligious assembly (the book club) while refusing to do the same for a religious assembly (the church).
c. Burden-Shifting
If the plaintiff makes out a prima facie case under the Equal Terms provision, RLUIPA shifts the burden to the government. 42 U.S.C. § 2000cc-2(b). The government could, for instance, argue that the plaintiff's selected comparators do not fit within the plain meaning of an "assembly or institution." Maybe the plaintiff selected hotels as a comparator. If so, a good argument that hotels do not actually qualify as "assemblies" could carry the day. See River of Life , 611 F.3d at 390 (Sykes, J., dissenting). Alternatively, the government might contend that the law does not treat the religious assembly or institution on "less than equal terms." This would be a near-impossible task when it comes to facial inequality cases. But in either gerrymandered or as-applied/selective inequality cases, the government could provide evidence showing that the law in question does not actually treat religious assemblies differently. Maybe other buildings use steeples such that a ban does not "almost only" target religious uses. Or, in as-applied/selective inequality cases, the government might have evidence showing that the plaintiff did in fact receive equal treatment compared to other nonreligious assemblies or institutions. See Centro Familiar Cristiano Buenas Nuevas v. City of Yuma , 651 F.3d 1163, 1173 (9th Cir. 2011). Indeed, that's where "similarly situated" can come into the analysis: not as a heightened pleading requirement on the plaintiff, but instead as a governmental rebuttal to an as-applied challenge. Id. With a truly neutral statute, courts can only analyze different treatment by digging into the context and determining whether the religious group really received "less than equal terms." Cf. id. at 1172 ; see also River of Life , 611 F.3d at 387 (Sykes, J., dissenting). RLUIPA puts the burden on the government, not the plaintiff, to make that showing.
One final point about the legal standard: because RLUIPA places the ultimate burden on the government, some courts have interpreted the text to include a strict scrutiny "safe harbor." 42 U.S.C. § 2000cc-2(b) ; Midrash Sephardi , 366 F.3d at 1232. For these courts, a zoning action that is a prima facie violation can be saved if the government can show that it satisfies strict scrutiny. But just as "similarly situated" does not appear anywhere in the Equal Terms provision, neither does "strict scrutiny" nor any other terms that might trigger a strict scrutiny analysis. And, again, when words do not appear in a statute, we should not add to what Congress has provided with what we think Congress should have provided. Congress could have told courts to apply strict scrutiny if the plaintiff makes out a prima facie case. In fact, Congress did exactly that-in a different provision in RLUIPA. Just a few lines above the Equal Terms subsection, Congress included a provision that prohibits governments from enacting land-use regulations that substantially burden religious exercise unless they have a "compelling governmental interest" and the regulation is the "least restrictive means" of furthering that interest. 42 U.S.C. § 2000cc(a)(1). We thus know that Congress was aware of the strict scrutiny buzzwords and included none of them in the Equal Terms provision. Centro Familiar , 651 F.3d at 1171 ("The Constitutional phrases, 'substantial *383 burden,' 'compelling governmental interest,' and 'least restrictive means' are all included in the 'substantial burden' provision, not the 'equal terms' provision."); Lighthouse Inst. , 510 F.3d at 269 ("[W]e find that Congress clearly signaled its intent that the operation of the Equal Terms provision not include strict scrutiny by the express language of [the Substantial Burden provision] ...."). We must respect that decision and refrain from adding it in ourselves. And that means that if governments do not carry their burden once shifted, RLUIPA holds them liable without exception.
III.
That brings us to this case. In order to generate more revenue for municipal services, the City of Upper Arlington enacted a land-use ordinance that partitioned parts of the City into office-district zones. The ordinance divided land uses into three categories. Some land uses were permitted outright, such as banks, beauty parlors, business offices, daycares, hospitals, and outpatient surgery centers. Others were strictly prohibited, including schools. And some had to apply to the City for a conditional use permit, such as places of worship.
In 2010, Tree of Life Christian Schools purchased an office building in an office-district zone. Tree of Life wanted to consolidate its three separate campuses into one central location. But Tree of Life ran into a problem: the ordinance prohibited its intended use. And the city was unwilling to grant it a conditional permit as a place of worship. So Tree of Life filed a complaint in federal court alleging, among other things, that the City's ordinance violated the Equal Terms provision.
a. Nonreligious Assemblies or Institutions
In its complaint, Tree of Life presented at least two possible nonreligious assemblies or institutions as comparators: hospitals and daycares. The first option is easy. Hospitals are formal establishments that provide a public good-namely, health care. Moreover, dictionaries define a hospital as a "charitable institution ." E.g. , Merriam-Webster , https://merriamwebster.com/dictionary/hospital (2018) (emphasis added). So a hospital serves as a proper comparator under the Equal Terms provision.
Similarly, daycares are assemblies, and the parties do not argue otherwise. Parents drop their children off each day with the common purpose of leaving them with adult supervisors. And the daycare's activities center around a common purpose. From play time to nap time, everything in a daycare involves watching (and maybe even educating) the kids. As such, it's hard to escape the conclusion that a daycare counts as an assembly. See River of Life , 611 F.3d at 390 (Sykes, J., dissenting). So a daycare also serves as a proper comparator.
Even so, the City argues that daycares are not a proper comparator because its ordinance no longer allows daycares in that district. As it turns out, the City amended its ordinance to exclude daycares after Tree of Life filed this lawsuit, and the district court sua sponte issued an injunction prohibiting the City from adding them back in. Given these developments, the City now contends that the district court's injunction nullifies daycares as a proper comparator for purposes of this case. The City is wrong for two reasons. First, when Tree of Life applied for a conditional use permit, the ordinance allowed daycares without reservation while banning schools and requiring that "places of worship, churches" petition for approval. Tree of Life seeks compensatory damages *384 for the harm it suffered because of this unequal treatment. And when a plaintiff seeks damages, courts focus on that harmful moment rather than looking at subsequent government actions. See Brandywine, Inc. v. City of Richmond , 359 F.3d 830, 835-36 (6th Cir. 2004) (holding that a subsequent zoning amendment did not moot claims for monetary damages). Otherwise, governments could always rewrite ordinances after-the-fact and avoid RLUIPA liability. Second, district courts cannot issue injunctions excising nonreligious assemblies from an ordinance to resolve an Equal Terms dispute. If they could, district courts could effectively nullify the Equal Terms provision by preventing plaintiffs from ever having valid comparators when bringing a claim. Plus, the proper remedy for Equal Terms violations is not to exclude the nonreligious but to include the religious. Cf. River of Life , 611 F.3d at 388 (Sykes, J., dissenting) ("The equal-terms provision is a remedy against exclusionary zoning; reading it to require equality of treatment with excluded secular assemblies ... gives religious assemblies no remedy at all.").
b. "Less Than Equal Terms"
Tree of Life has also presented evidence showing that the ordinance treats it on "less than equal terms" than nonreligious assemblies or institutions under both the facial inequality theory and the as-applied/selective inequality theory. I address each in turn.
Facial inequality. As noted above, an ordinance treats a religious assembly on "less than equal terms" if it makes a distinction on its face. And the City's ordinance does just that. The ordinance allows daycares and hospitals to set up shop while requiring that "places of worship, churches" apply for a conditional use permit. The ordinance thus requires religious assemblies to take extra steps that nonreligious assemblies do not have to take. This express distinction establishes unequal treatment. Elijah Grp., Inc. v. City of Leon Valley , 643 F.3d 419, 424 (5th Cir. 2011) ; Centro Familiar , 651 F.3d at 1171.
The district court erred in holding otherwise. The district court thought that, because the ordinance treated all schools on equal terms, the ordinance did not facially violate RLUIPA. But that comparison is too narrow. The Equal Terms provision focuses on whether the ordinance treats religious assemblies and institutions on equal terms with all nonreligious assemblies and institutions. The comparators need not be of the same species.[4] Any assembly or institution-here, church versus daycare or hospital-will do.
But the City advances another reason why the ordinance would survive a facial challenge. It contends that because Tree of Life's "proposed primary use" was to establish a private school, it does not qualify as a "place of worship, church" as that phrase is used in the ordinance. The ordinance, however, does not define "place of worship, church" or expressly exclude private religious schools from that category.
Nevertheless, the City argues that customary dictionary definitions prove that a school is not a place of worship. But the City did not actually provide any definitions. And a closer look at dictionaries reveals that the City's customary definition is not so customary. Most dictionaries define a "place of worship" as "a building where people gather to worship together."
*385 E.g. , Collins English Dictionary , https://www.collinsdictionary.com/us/dictionary/english/place-of-worship (2018); see also Merriam-Webster , https://www.merriam-webster.com/dictionary/worship (2018) (defining "worship" as "honor[ing] or rever[ing] ... a divine being"). And Tree of Life's mission is to "glorify God by educating students in His truth and discipling them in Christ." R. 2, Pg. ID 5. In doing so, Tree of Life "puts the Bible at the center" of its educational model and requires all students to evaluate their studies "through the lens of God's Word." R. 2, Pg. ID 5. So students and teachers gather together to honor God through education. That looks a lot like a "place of worship." In concluding otherwise, it appears that the City relied on its own subjective notions of worship-the exact unchecked discretion that RLUIPA prohibits. Campbell, supra , at 1082 ("[Z]oning laws are 'commonly administered through individualized processes not controlled by neutral and generally applicable rules.' " (quoting H.R. Rep. No. 106-219, at 24 ) ); see Joint Statement at 16,699 ("Churches ... are often frequently discriminated against ... in the highly individualized and discretionary processes of land use regulation."). As such, the City's ordinance facially discriminates, and the City used the ordinance to discriminate against Tree of Life. The City is liable.[5]
The majority claims that Tree of Life cannot succeed under a facial challenge because it abandoned any argument that it is a "place of worship." Majority Op. at 366. But the majority misses the bigger picture. Tree of Life brought one claim: under RLUIPA, the City's ordinance treated it on "less than equal terms" than nonreligious assemblies or institutions. And it advanced multiple arguments to support that claim. When the district court held that the ordinance did not violate the Equal Terms provision, that judgment subsumed all of those arguments.[6] Yet, on appeal, Tree of Life continues to press the same claim, supported (if not in the exact same words) by the same arguments. See Kamen v. Kemper Fin. Servs., Inc. , 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); see also Lebron v. Nat'l R.R. Passenger Corp. , 513 U.S. 374, 379, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995) ("Our traditional rule is that '[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.' " (quoting Yee v. Escondido , 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) ) ). At oral argument, Tree of Life contended that it is a place of *386 worship and that it has not abandoned its facial argument. Oral Arg. at 1:27-3:45. And Tree of Life's brief contains everything necessary for that argument. In making its as-applied argument, Tree of Life also discussed all the necessary elements for the facial argument, just without the labels. Cf. McNeal v. Kott , 590 F. App'x 566, 569 (6th Cir. 2014) (holding that, in the qualified immunity context, "[o]ne does not forfeit [an argument] by making [other] arguments that, if accepted, establish [the first argument]"). Plus, in its opposing brief, the City classifies "Tree of Life [a]s a school, not a church" to argue that its ordinance is nondiscriminatory. Appellee Br. 5, 44. Therefore, in the court's analysis of the ordinance, the City's proffered classification of Tree of Life-as a school and not a place of worship-should not be beyond judicial review just because Tree of Life did not use "magic words" in its own brief. See Campbell, supra , at 1103 (criticizing Equal Terms jurisprudence that "removes a government's regulatory objectives from judicial scrutiny").
As-applied/selective inequality . Tree of Life also demonstrated that the ordinance violates the Equal Terms provision under an as-applied/selective inequality theory. Even assuming Tree of Life does not qualify as a "place of worship," it still faced a blanket ban, which other nonreligious assemblies and institutions did not. The ordinance bans schools, including Tree of Life. But the ordinance permits some nonreligious assemblies and institutions as of right-daycares and hospitals needed to do no more than set up shop in the district. So when the City denied Tree of Life's use-despite allowing daycares and hospitals without question-it treated Tree of Life on "less than equal terms" than nonreligious assemblies and institutions.
c. Burden-Shifting
The City makes two arguments to rebut Tree of Life's prima facie case. Both are unavailing.
Tax Revenue. First, the City argues that it did not treat Tree of Life unequally because every other comparator-daycares and hospitals included-produced far more tax revenue to the City than Tree of Life ever could. Thus, according to the City, it treated Tree of Life equally: revenue generation is what counts in zoning decisions under the ordinance, and Tree of Life produces less revenue. But that is only true if you let the City decide how to quantify revenue after the fact. For instance, one could measure revenue in total dollars. And under that metric, Tree of Life generates more tax dollars than the existing daycares in the district. But (at least in this case) the City does not want the courts to look at total dollars-only revenue per square foot . This tactic feels a lot like "heads the City wins, tails Tree of Life loses." And if cities can take a vague regulatory purpose and define the parameters during the course of litigation, they can always avoid RLUIPA liability. All they have to do is find the parameters that make them win. See River of Life , 611 F.3d at 371 (criticizing the use of regulatory purpose as a "guide to interpretation" because such a use would make RLUIPA turn on the subjective notions of local officials). Of course, if the ordinance itself mandated a particular way of calculating revenue, the case might be different. But here, the City's formula is something of a liability-avoiding chameleon.
Schools. The City also argues that, irrespective of tax revenue, it did not treat Tree of Life differently because of religion. Rather, the City prohibited Tree of Life because it was a school . And since the ordinance prohibits all schools, the City did not treat Tree of Life on "less than *387 equal terms" than any other school. That argument fails for two reasons. First, the City did not need to treat Tree of Life differently because of religion to violate the Equal Terms provision. RLUIPA has an entirely separate section dealing with discrimination because of religion. 42 U.S.C. § 2000cc(b)(2). The language of the Equal Terms provision, by contrast, requires no motive or bias. River of Life , 611 F.3d at 382 (Sykes, J., dissenting). The plain language targets all unequal treatment. Reading intent into the Equal Terms provision would make the separate Antidiscrimination provision superfluous. And that is something that ordinary principles of statutory interpretation forbid us from doing. Reiter v. Sonotone Corp. , 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) ("In construing a statute we are obliged to give effect ... to every word Congress used.").
Nor does pointing to a blanket ban on schools suffice to show that the City's treatment of Tree of Life was equal. Here again, the City's argument hinges on limiting the relevant inquiry to comparing schools. But the Equal Terms provision broadens the inquiry to all assemblies and institutions-after all, Tree of Life made out a prima facie case by showing that it had been treated differently from a daycare or a hospital. So rebutting Tree of Life's prima facie case is not as easy as labeling Tree of Life a school and a daycare not a school. The City must justify treating schools differently from daycares or hospitals. And it has not done so.
Accordingly, the City did not meet its burden of rebutting Tree of Life's prima facie case. It is liable under RLUIPA, and I would reverse.
* * *
There comes a time with every law when the Supreme Court must revisit what the circuits are doing. That time has come. Every circuit to address the issue has given its own gloss to the Equal Terms provision. Whether a religious plaintiff can succeed under the Equal Terms provision thus depends entirely on where it sues. And not only have the circuits split on the issue, but many of them have also neutralized the Equal Terms provision. By importing words into the text of the statute, the courts have usurped the legislative role and replaced their will for the will of the people. See The Federalist No. 47, at 325 (James Madison) (J. Cooke ed., 1961) ("Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator." (quoting 1 Baron de Montesquieu, The Spirit of Laws ) ).

Some circuits have required the plaintiff to show that it is "similarly situated for all functional intents and purposes." Third Church of Christ, Scientist v. City of New York , 626 F.3d 667, 668 (2d Cir. 2010). Other circuits narrowed the inquiry by asking that the plaintiff show that it is "similarly situated" as to the challenged law's "regulatory purpose." Lighthouse Inst. for Evangelism v. City of Long Beach , 510 F.3d 253, 266 (3d Cir. 2007). The Seventh Circuit then altered the test further, looking not at a plaintiff similarly situated as to the regulatory purpose but rather one similarly situated as to "accepted zoning criteria." River of Life , 611 F.3d at 371 ; but see id. at 386 (Sykes, J., dissenting) (arguing that "[t]he distinction between 'accepted zoning criteria' and the 'regulatory purpose' of exclusionary zoning is nonexistent or too subtle to make any difference"). Whatever form the requirement takes, courts have read words into the statute that Congress did not provide.

The majority states that "equal terms" is ambiguous without putting forth any reasons why it is ambiguous. Majority Op. at 370; see Duncan v. Muzyn , 885 F.3d 422, 425 (6th Cir. 2018) ("[S]imply calling something ambiguous does not make it so."). As I explain, the Equal Terms provision is clear. See infra Part II. Moreover, in rushing to find ambiguity, the majority replaces Congress's enacted text with its own preferences. As judges, we are not at liberty to use statutory ambiguity as a device to make policy from the bench. Cf . Raymond M. Kethledge, Ambiguities and Agency Cases: Reflections After (Almost) Ten Years on the Bench , 70 Vand. L. Rev. En Banc 315, 316 (2017) ("There is nothing so liberating for a judge as the discovery of an ambiguity. For once a judge discovers an ambiguity ... [t]he statutory text approved by Congress and (usually) signed by the President becomes an afterthought."); see also Yates v. United States , --- U.S. ----, 135 S.Ct. 1074, 1097, 191 L.Ed.2d 64 (2015) (Kagan, J., dissenting) (criticizing the use of canons of construction to create ambiguity where the "statute's text and structure suggests none" (quoting Ali v. Fed. Bureau of Prisons , 552 U.S. 214, 227, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008) ) ); King v. Burwell , --- U.S. ----, 135 S.Ct. 2480, 2502, 192 L.Ed.2d 483 (2015) (Scalia, J., dissenting) ("[E]ven the most formidable argument concerning the statute's purposes could not overcome the clarity [of] the statute's text." (quoting Kloeckner v. Solis , 568 U.S. 41, 55 n.4, 133 S.Ct. 596, 184 L.Ed.2d 433 (2012) ) ); Brett M. Kavanaugh, Fixing Statutory Interpretation , 129 Harv. L. Rev. 2118, 2134-59 (2016) (book review) (arguing against ambiguity-based decisions in statutory interpretation and suggesting a "best reading" approach to avoid policymaking by judges).

Some courts have suggested that a plain meaning interpretation of the Equal Terms provision may create constitutional problems. River of Life , 611 F.3d at 370 ; Lighthouse Inst. , 510 F.3d at 267 n.11. If true, the constitutional avoidance doctrine might allow courts to give the Equal Terms provision a narrow reading to avoid the broader reading's constitutional problems. Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council , 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). But the avoidance canon has a notable exception: Courts cannot narrow a statute if the narrower interpretation is "plainly contrary to the intent of Congress." Id. Congress gave such a contrary intent in RLUIPA when it instructed courts "to construe the statute in favor of a broad protection of religious exercise, to the maximum extent permitted." 42 U.S.C. § 2000cc-3(g). In any event, the parties here have not argued that the Equal Terms provision runs afoul of the Constitution, so I express no opinion on the matter. See River of Life , 611 F.3d at 391 (Sykes, J., dissenting) (noting that whether the Equal Terms provision exceeds Congress's authority "is an important and sensitive question that should not be resolved unless raised and fully briefed"); but see Campbell, supra , at 1094-99 (explaining why a plain meaning approach has no constitutional problems under § 5 of the Fourteenth Amendment).

Moreover, if we limited the comparators to schools, then municipalities would always have the upper hand because they can presumably place public schools wherever they see fit. So public, nonreligious schools would never actually face the prohibition at issue here. Private, religious schools, on the other hand, always would.

In a prior appeal, this court made an off-hand comment about the ordinance being neutral for constitutional purposes. Tree of Life Christian Schs. v. City of Upper Arlington , 823 F.3d 365, 373 (6th Cir. 2016). That statement, however, did not constitute a holding. The court mentioned facial neutrality in only one sentence with no reasoning-and it did so in the constitutional context, not in the Equal Terms context. Because this court did not squarely consider whether the ordinance here was facially neutral, the law-of-the-case doctrine does not prevent us from holding otherwise. Moody v. Mich. Gaming Control Bd. , 871 F.3d 420, 425 (6th Cir. 2017) (noting that the law-of-the-case doctrine "does not extend ... to issues not 'fully briefed [or] squarely decided in an earlier appeal' " (quoting Burley v. Gagacki , 834 F.3d 606, 618 (6th Cir. 2016) ) ).

Because the district court used the wrong legal framework, we should at the very least remand to the district court to determine whether the ordinance is facially neutral under the Equal Terms provision.